**Ronald CHISOLM, Plaintiff,**

v.

**Patrick MANIMON, Jr., et al., Defendants.**

**Civil Action No. 95–991(MLC).**

United States District Court, D. New Jersey.

May 18, 2000.

Clara R. Smit, East Brunswick, NJ, for Plaintiff.

Alfred B. Vuocolo, Jr., Mercer County Counsel, Trenton, NJ, for Defendant Patrick McManimon, Jr.

## MEMORANDUM OPINION

COOPER, District Judge.

Ronald Chisolm, who is deaf, commenced this action in March 1995, alleging principally that his rights under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), under § 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act"), and under the New Jersey Law Against Discrimination, N.J.S.A. 10:5–4.1 ("LAD"), were violated while he was housed at the Mercer County Detention Center ("MCDC") from September 10, 1994 to September 14, 1994. (Compl. filed 3–6–95; Am. Compl. filed 3–25–96.) This matter is presently before the Court on the parties' motions for summary judgment. Plaintiff has moved for summary judgment as to liability on the ADA, Rehabilitation Act, and LAD claims. The only remaining defendant, former Director of MCDC Patrick McManimon,[1] has moved for summary judgment on all claims. For the reasons explained below,

### 617

plaintiff's motion will be denied and defendant's motion will be granted.

## FACTS AND PROCEDURAL HISTORY

In 1987, Ronald Chisolm was convicted of driving under the influence of alcohol ("DUI") in Bucks County, Pennsylvania. His sentence for the DUI conviction included a requirement that he complete an intoxicated-driver resource course. According to Chisolm, there were delays in providing him with an interpreter for the course. As a result, Chisolm did not complete the course and in 1990, a warrant for his arrest was issued by Bucks County authorities because he had not fulfilled his DUI sentence. (Pl.'s Br. in Supp. at 3; Def.'s Br. in Supp. at 1.)

On September 10, 1994, while driving in Princeton Borough, Chisolm was stopped by the police because of the Bucks County warrant. The Princeton police arrested Chisolm and brought him to MCDC to await a hearing on his extradition to Pennsylvania. (Pl.'s Br. in Supp. at 3; Def.'s Br. in Supp. at 1.)

Chisolm arrived at MCDC at 3:40 p.m. on Saturday, September 10, 1994. (Certif. of Clara R. Smit, Esq. filed 5–5–00 ("Smit Certif."), Ex. F, MCDC face sheet for Ronald Chisolm.) He initially was placed in the Receiving and Discharge ("R & D") Unit, an area of the jail where newly arrived inmates were held until their proper housing placement within the institution could be determined. (Aff. of Patrick McManimon filed 5–5–00 ("McManimon Aff."), ¶¶ 5–7.) Later that day, Chisolm was interviewed by an MCDC staff nurse and it was determined that he presented a suicide risk. (Def.'s Br. in Supp., Ex. B, Dep. of Ronald Chisolm ("Chisolm Dep.") at 71; McManimon Aff. ¶ 7.) Therefore, Chisolm remained in the R & D Unit on suicide watch until Tuesday, September

---

1. Defendant is misdesignated as "Patrick Manimon" in the Complaint and Amended Complaint. (*See* Am. Compl., Caption.) However, herein we will use the correct spelling of his name, "McManimon". (*See* Answer to Am. Compl. filed 4–2–96, Caption.)

13, 1994, when he was no longer a suicide risk and could be placed in general population. (Smit Certif., Ex. C, MCDC Movement History of Ronald Chisolm; Smit Certif., Ex. D, Certif. of Kenneth Knight ("Knight Certif.") ¶¶ 5, 7.) From September 13th until September 14th, Chisolm was housed on the 4 North living unit. (Def.'s Br. in Supp. at 1; Smit Certif., Ex. C, MCDC Movement History of Ronald Chisolm.) On September 14, 1994, Chisolm's lawyer reached an agreement with the Bucks County prosecutor on a method for fulfilling his obligation to attend an intoxicated-driver course. The prosecutor therefore quashed the warrant and Chisolm was released from MCDC. (Smit Certif., Ex. G, Ltr. from Ellis B. Klein, Bucks County Assistant District Attorney, to Clara Smit, Esq., dated 9–16–94.)

During the weekend of September 10–11, 1994, Chisolm communicated with MCDC staff primarily in writing. (Chisolm Dep. at 20–21.) He requested to use a telecommunications device for the deaf ("TDD"), but was told that the jail did not have one.[2] (*Id.* at 22.) On the morning of Monday, September 12th, defendant McManimon learned that a deaf inmate had arrived at MCDC over the weekend and McManimon assigned Donna Walker, a program services penal counselor, to assist Chisolm. (Def.'s Br. in Supp., Ex. C, Dep. of Donna Walker ("Walker Dep.") at 6; McManimon Aff. ¶ 8.) Whenever Chisolm wanted to see Walker, he would hand a note to a guard, asking that she be summoned. (Chisolm Dep. at 40.) Chisolm communicated with Walker primarily through written notes, with some limited English speech by Chisolm to Walker. (*Id.* at 31; Walker Dep. at 13, 74.) Although MCDC staff usually are not allowed to contact third parties for inmates, Walker was allowed to make such contacts at Chisolm's request. For example, Walker contacted Chisolm's roommate and an alcohol treatment program that was instrumental in fulfilling the conditions for Chisolm's release. (McManimon Aff. ¶ 14; Walker Dep. at 14, 36–37.) In addition, when McManimon was informed by Walker that MCDC did not have a TDD, he directed that one be purchased. (McManimon Aff. ¶ 11.)

To permit Chisolm to communicate by telephone despite MCDC's inability to furnish a TDD immediately, Chisolm's roommate, Kenneth Knight, was allowed to bring Chisolm's own TDD to the jail. (Walker Dep. at 16.) Knight delivered Chisolm's TDD to MCDC on Monday, September 12, 1994. (Knight Certif. ¶ 6.) Like all items brought into MCDC, the TDD had to be searched for contraband before any inmate could be permitted access to it. After the necessary security procedures had been completed, the TDD was given to Chisolm on Tuesday, September 13th. (McManimon Aff. ¶ 10; Chisolm Dep. at 25–26, 28.) The TDD could not be kept in Chisolm's cell because it might have been possible for inmates to fashion parts of the TDD into weapons. (McManimon Aff. ¶ 12.) When Chisolm wished to use the TDD, he would ask a guard to bring Walker to see him. Walker then would have Chisolm released from his cell and would allow him to make the desired call with the TDD. (Walker Dep. at 23, 33–35, 106, 124–25; Chisolm Dep. at 40, 69.) Although other inmates usually were subject to a fifteen-minute time limit on telephone calls, Chisolm was permitted to make calls using the TDD without any time limit. (Walker Dep. at 35, 110–11, 121; Chisolm Dep. at 69.)

Chisolm first requested an interpreter when he spoke to Donna Walker on Mon-

---

2. A TDD is a text telephone that allows deaf persons to communicate by typing in messages and by reading on a screen the messages typed in by others. *See Niece v. Fitzner,* 922 F.Supp. 1208, 1212 (E.D.Mich.1996); *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1027 (S.D.N.Y.1995). A TDD apparently is also known as a TTY and is so designated in some of the parties' submissions herein. For the sake of consistency, we will use only the term TDD to refer to a text telephone.

day, September 12th. (Chisolm Dep. at 37.) Although MCDC staff did not play any role in the scheduling of court dates for inmates, Walker was concerned that the court should be made aware of Chisolm's need for an interpreter. Walker therefore called an unidentified woman at the Mercer County Superior Court and received assurances that the court would provide an interpreter for Chisolm's extradition hearing. (Walker Dep. at 24–29, 70–71.) Walker also called various agencies which provide assistance to deaf persons, attempting unsuccessfully to locate an interpreter who might be available, if need arose, to assist Chisolm in communicating with his lawyer or in, e.g., any disciplinary proceedings or challenges to classification status at MCDC. (Id. at 30–32, 71–72, 97–98; McManimon Aff. ¶ 13.) Walker was not seeking an interpreter to assist Chisolm with his routine communications with staff at MCDC, because she knew that security considerations would not permit the presence of a civilian in the inmate housing areas of the jail. (Walker Dep. at 71–72; McManimon Aff. ¶ 13.)

Inmates at MCDC had access to a television on some but not all of the living units. (Walker Dep. at 85–90.) On the R & D Unit, where Chisolm was housed from September 10 to 13, 1994, there was no television. (Id. at 120; McManimon Aff. ¶¶ 6, 7.) On the 4 North tier, where Chisolm was housed from September 13th until his release on September 14th, inmates could watch a television in a common area during the times of day when they were allowed out of their cells. (Walker Dep. at 85–90.) The televisions at MCDC were equipped with closed captioning which could be activated upon an inmate's request. (Id. at 92; McManimon Aff. ¶ 16.)

Chisolm filed this action on March 6, 1995, originally naming as a defendant, in addition to McManimon, the Judiciary of New Jersey, Mercer Vicinage ("Mercer Vicinage").[3] (Compl. filed 3–6–95.) By Order entered June 11, 1997, the Honorable Garrett E. Brown, Jr., to whom this action originally was assigned, dismissed all claims against Mercer Vicinage. The Court reasoned that: (1) the ADA and Rehabilitation Act claims against Mercer Vicinage were without merit because Mercer Vicinage did not exclude Chisolm from a program (i.e., his extradition hearing) by failing to provide an interpreter, insofar as no extradition hearing was held; (2) the § 1983 claim for damages against this defendant was barred by the Eleventh Amendment, and Chisolm lacked standing to pursue a § 1983 claim for injunctive relief because he was in no danger of future harm; and (3) the Court lacked subject-matter jurisdiction over the state-law claims against Mercer Vicinage. (Mem. Op. filed 6–11–97 at 10–15.) Subsequently, on March 10, 1998, the Court granted summary judgment in favor of McManimon on plaintiff's individual-capacity claims for damages under the ADA and Rehabilitation Act, holding that McManimon was entitled to qualified immunity against such claims. (Order entered 3–10–98.)

Thus, in its present posture, this action encompasses: (1) an ADA claim against McManimon in his official capacity; (2) a Rehabilitation Act claim against McManimon in his official capacity; (3) a LAD claim against McManimon; and (4) a § 1983 claim against McManimon. (See Am. Compl., "Factual Allegations," ¶ 6; "First Count," ¶ 2.) The factual bases of plaintiff's claims are that MCDC "failed to provide specific auxiliary aids such as[:] 1) TDD, telecommunication device for the deaf[;] 2)[i]nterpreter [s]ervices[;] and 3)[c]losed [c]aptioning." (Pl.'s Br. in Supp. at 1.) Plaintiff has moved for summary judgment as to the question of liability on only the ADA, Rehabilitation Act, and

---

3. The Mercer Vicinage was incorrectly named as "Mercer County Court" in the Complaint and Amended Complaint. (Compl., Caption; Am. Compl. filed 3–25–96, Caption; Answer of Mercer Vicinage filed 9–1–95, p. 1.)

LAD claims. (Notice of Mot. filed 11–19–99.) Defendant McManimon has moved for summary judgment on all claims that remain pending, *i.e.*, on Chisolm's § 1983 claim as well as the claims under the ADA, Rehabilitation Act, and LAD. (Notice of Mot. filed 11–23–99.)

## DISCUSSION

### I. Summary Judgment Standards

Under Federal Rule of Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party opposing the motion "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The adverse party must do more than assert some metaphysical doubt as to the material facts; "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat. Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 248–50, 106 S.Ct. 2505. Thus, summary judgment is appropriate not only if an opposing party fails entirely to support its position with evidence, but also if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

### II. Claims under the ADA, Rehabilitation Act, and LAD

Title II of the ADA provides that qualified disabled persons shall not "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This provision of the ADA applies to services, programs, and activities provided within correctional institutions. *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). Similarly, the Rehabilitation Act, 29 U.S.C. § 794(a), provides that a qualified disabled person shall not, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...."[4]

---

4. Defendant argues that MCDC did not receive any federal funds and therefore is not subject to the Rehabilitation Act. (Def.'s Br. in Supp. at 9; *id.,* Ex. E, Certif. of Steven H. Zielinski; McManimon Aff. ¶ 15.) However, plaintiff contends that the receipt of federal funding by the County of Mercer would be sufficient to place MCDC within the ambit of the applicable provision of the Rehabilitation Act. (Pl.'s Br. in Opp'n at 25–27.) There does not appear to be sufficient factual development of this issue to permit a definitive rul-

The LAD provides that "[a]ll persons shall have the opportunity ... to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation" without discrimination on the basis of handicap. N.J.S.A. 10:5–4, 10:5–4.1. Defendant argues that, regardless of the applicability of the ADA and Rehabilitation Act, the LAD should not be applied to correctional institutions because prisons and jails are not places of "public accommodation" within the meaning of N.J.S.A. 10:5–4. (Def.'s Br. in Supp. at 10–12.) However, we do not find defendant's argument persuasive.

In construing a state-law question as to which there is no controlling state precedent, a federal court generally applies state law as interpreted by the state's highest court in order to predict how that court would rule on the question. *Gares v. Willingboro Twp.*, 90 F.3d 720, 725 (3d Cir.1996). In the absence of guidance from the state's highest court, the federal court considers decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule. *Id.* If decisions from the state's highest court or intermediate appellate courts do not resolve the question, the federal court may also look to " 'analogous decisions, considered dicta ... and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.' " *Id.* (quoting *McGowan v. University of Scranton*, 759 F.2d 287, 291 (3d Cir.1985)). We do not find any New Jersey decisions directly addressing the question of whether a jail is a "place of public accommodation" under N.J.S.A. 10:5–4, so we will approach the question by applying analogous principles from opinions of the New Jersey courts on related topics.

The LAD consistently is accorded a broad construction and, in regard to its prohibition of discrimination on the basis of disability, " '[t]he paramount purpose of the statute is to secure to handicapped individuals full and equal access to society, bounded only by the actual physical limits that they cannot surmount. ...' " *Olson v. General Elec. Astrospace*, 101 F.3d 947, 956 (3d Cir.1996) (quoting *Andersen v. Exxon Co., U.S.A.*, 89 N.J. 483, 495, 446 A.2d 486, 492 (1982)). In interpreting the LAD, the New Jersey courts "have repeatedly recognized its humanitarian concerns, its remedial nature and the liberal construction to be accorded it." *Panettieri v. C.V. Hill Refrig.*, 159 N.J.Super. 472, 483, 388 A.2d 630, 635 (App.Div.1978).

The New Jersey courts generally interpret the LAD by reliance upon federal court decisions construing the analogous federal antidiscrimination statutes. For example, in LAD employment discrimination cases, federal precedents under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17, provide a key source of interpretive authority. *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 600, 626 A.2d 445, 452 (1993). In LAD cases specifically involving age discrimination in employment, New Jersey courts adopt the analysis of federal Title VII cases and federal cases under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq. Giammario v. Trenton Bd. of Educ.*, 203 N.J.Super. 356, 361, 497 A.2d 199, 202 (App.Div.1985). Further, in LAD disability discrimination cases, the New Jersey courts look to the standards established in federal ADA cases. *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 70 (3d Cir. 1996).

Considering the foregoing principles, we predict that the New Jersey Supreme Court would find that jails and prisons are "places of public accommodation" pursuant to N.J.S.A. 10:5–4. This conclusion accords with the usual liberal construction of the LAD. Furthermore, because the New

ing. At any rate, because we will find that defendant reasonably accommodated plaintiff's disability, we will not reach the question of whether MCDC received any "Federal financial assistance" within the meaning of 29 U.S.C. § 794(a).

Jersey courts typically look to federal anti-discrimination law in construing the LAD, the New Jersey Supreme Court most likely would apply the United States Supreme Court's holding in *Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215, to find that the LAD applies to programs and activities offered within correctional institutions. Finally, in an analogous context, a New Jersey trial court has held that a hospital is a "place of public accommodation" within N.J.S.A. 10:5–4. *Estate of Behringer v. The Medical Center at Princeton,* 249 N.J.Super. 597, 592 A.2d 1251 (Law Div.1991). We note that a hospital, like a jail, is a place where most people would prefer not to be housed. Therefore, based on the broad principles governing the LAD, the usual practice of adopting federal antidiscrimination law, and the decision of a New Jersey lower court in an analogous context, we find that the New Jersey Supreme Court, if squarely faced with the question, would hold that the LAD applies to prisons and jails.

Thus the LAD, as well as the ADA and Rehabilitation Act, all potentially apply to the situation set forth in Chisolm's complaint. We therefore will proceed to examine whether plaintiff has established a sufficient factual basis to permit a reasonable jury to return a verdict in his favor on the substantive elements of these claims. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248–50, 106 S.Ct. 2505 (defendant's motion for summary judgment cannot be defeated where plaintiff's evidence is merely colorable or not significantly probative). As we explain below, we will find that Chisolm has not established such a basis for a verdict in his favor, because defendant McManimon made accommodations for Chisolm's deafness which were reasonable, given the necessary constraints of a correctional facility.

■ The factors and standards governing questions of alleged violations of the ADA are the same as those governing claims brought under the Rehabilitation Act. *Duffy v. Riveland,* 98 F.3d 447, 455 (9th Cir.1996) (adopting for an ADA claim the factors relevant in analyzing Rehabilitation Act claims); *Helen L. v. DiDario,* 46 F.3d 325, 330–31 (3d Cir.1995) (law developed under Rehabilitation Act is applicable to Title II of ADA); *Darian v. University of Massachusetts Boston,* 980 F.Supp. 77, 84 (D.Mass.1997) ("Rehabilitation Act cases provide precedent for the ADA"); *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995) ("[t]he requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act"). In addition, as mentioned above, the standards applied in state-law LAD cases are the same as those established in federal ADA cases. *Lawrence v. National Westminster Bank,* 98 F.3d at 70; *see also Olson v. General Elec. Astrospace,* 101 F.3d at 956 (in context of disability employment discrimination claim, "[i]t is clear that the same *McDonnell Douglas [Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),]* framework that guides us under the ADA would also guide a New Jersey court under the LAD"). Therefore, while we will base the following discussion upon the standards specific to ADA claims, the analysis and the result will apply equally to plaintiff's Rehabilitation Act and LAD claims.

■ To state a claim under Title II of the ADA, a plaintiff must show that: (1) he is a qualified person with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *Calloway v. Boro of Glassboro Dep't of Police,* 89 F.Supp.2d 543, 551 (D.N.J.2000). In addition, the regulations promulgated by the Department of Justice pursuant to the ADA, which are entitled to substantial deference, *see Helen L. v. DiDario,* 46 F.3d at 331–32, require public entities to provide disabled persons with the auxiliary aids and

services that may be necessary to afford such persons an equal opportunity to participate in benefits, services, programs, or activities. 28 C.F.R. § 35.160(b)(1). For deaf or hearing-impaired persons, those auxiliary aids and services may include "[q]ualified interpreters, notetakers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods. . . ." 28 C.F.R. § 35.104.

■ While public entities are required under the ADA to provide reasonable accommodation for persons with disabilities, they are not required to go beyond what may be reasonable. Accommodation is not reasonable if it either imposes undue financial and administrative burdens on a public entity, or requires a fundamental alteration in the nature of the program. *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (construing "reasonable accommodation" in context of Rehabilitation Act claim); *see also* 28 C.F.R. § 35.150(a)(3) (ADA regulations do not require a public entity "to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue

financial and administrative burdens"). Particularly when applying the ADA in a prison setting, the courts must be mindful of how concerns with security and orderly administration may inform questions of the reasonableness of accommodations. *See Gates v. Rowland*, 39 F.3d 1439 (9th Cir. 1994) (adopting in ADA cases the *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), test for judicial deference to prison management decisions); *accord, Onishea v. Hopper*, 171 F.3d 1289 (11th Cir.1999). *But see Yeskey · v. Commonwealth of Pennsylvania Dept. of Corrections*, 118 F.3d 168, 174–75 & n. 8 (3d Cir.1997) (declining to decide question of whether *Turner v. Safley* should be applied to statutory as well as constitutional claims), *aff'd on other grounds*, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998).

■ In the present case, Chisolm claims that the ADA was violated because MCDC "failed to provide specific auxiliary aids such as[:] 1) TDD, telecommunication device for the deaf[;] 2)[i]nterpreter [s]ervices[;] and 3)[c]losed [c]aptioning."[5] (Pl.'s Br. in Supp. at 1.) There is no dispute that these aids are among the types of accommodations specifically sanctioned in the Justice Department's regulations interpreting the ADA. *See* 28 C.F.R. § 35.104.

We conclude that any rational trier of fact would find that reasonable accommo-

---

5. While Chisolm is not emphasizing this point in the context of the present summary judgment motions, he may also be asserting a more general claim that he was "subjected to discrimination," 42 U.S.C. § 12132, at MCDC. However, the only specific instance of such discrimination noted by plaintiff is that, during his intake process, an MCDC staff member referred to him as a "deaf mute." (*See* Smit Certif., Ex. F, MCDC face sheet for Ronald Chisolm.) While Chisolm persuasively points out why this phrase is discriminatory, (*see* Chisolm Dep. at 10, 72), the fact that the phrase would give offense is not necessarily obvious to persons who may not have any ongoing personal or professional involvement with deaf persons. *See, e.g., Randolph v. Rodgers*, 170 F.3d 850, 853 (8th Cir.1999)

(court's opinion refers to plaintiff as "a deaf-mute prisoner").

Nonetheless, the MCDC staff's use of the phrase "deaf mute" to refer to Chisolm was very unfortunate and it would certainly be appropriate for corrections administrators to caution staff not to use this phrase in the future. However, we cannot find that an isolated instance of describing a deaf person in these terms rises to the level of discrimination on the basis of disability which would violate the ADA or the Rehabilitation Act. *See Dungee v. Northeast Foods, Inc.*, 940 F.Supp. 682, 687–88 (D.N.J.1996) (evidence of defendants' isolated remarks insufficient to withstand summary judgment motion in action alleging age and sex discrimination in employment).

dations were provided to Chisolm by defendant, and that any requested accommodations which were not provided, such as an interpreter to accompany Chisolm in the jail housing units or permission to keep the TDD in Chisolm's cell, would not have been reasonable in the setting of a correctional institution. *See McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 855 (5th Cir.1993) (summary judgment for defendants affirmed where reasonable men could not differ from conclusion that law school provided reasonable accommodations for disabled student); *Darian v. University of Massachusetts Boston*, 980 F.Supp. at 88 ("reasonable accommodation" ordinarily an issue of fact, but summary judgment nonetheless appropriate where record contains undisputed facts demonstrating such accommodation for disabled student).

When McManimon learned that MCDC could not immediately provide a TDD for Chisolm's use, he ordered the purchase of one and also permitted Chisolm to have his own TDD brought from home. (McManimon Aff. ¶ 11; Walker Dep. at 16.) The brief delay between the TDD's arrival at MCDC and Chisolm's access to it was necessary for security reasons. (McManimon Aff. ¶ 10.) Further, it would not have been a reasonable accommodation to permit plaintiff to have an interpreter available at all times. *See Randolph v. Rodgers*, 170 F.3d at 859 (summary judgment for inmate reversed on issue of provision of sign-language interpreter for educational programs and non-emergency medical care; inmate's request for interpreter created safety and security issues and placed financial burden on prison). During his four days at MCDC, Chisolm did not encounter the particular events, *e.g.*, a disciplinary hearing or a long-term permanent classification, which courts have found to require a sign-language interpreter. *See, e.g., Duffy v. Riveland*, 98 F.3d at 451, 455 (for deaf inmate incarcerated since 1983, disciplinary hearing resulting in fifteen days' segregation and classification hearing denying pre-release placement were

"programs" within meaning of ADA); *Clarkson v. Coughlin*, 898 F.Supp. at 1045–46 (long-term state inmates entitled to sign-language interpreters for extensive reception, testing, and classification process resulting in permanent assignments to particular prisons). Closed captioned television was available to Chisolm once he had been transferred to 4 North. (McManimon Aff. ¶ 16.) However, Chisolm has not presented any evidence that he requested MCDC staff to activate the captioning. *See Randolph v. Rodgers*, 170 F.3d at 858 ("public entities are not required to guess at what accommodations they should provide").

In contrast to Chisolm's situation, those cases upholding the rights of deaf or hearing-impaired inmates to additional accommodations generally involve inmates who were being confined for lengthy sentences and who were placed in institutions where a substantial disabled population might be expected. For example, *Clarkson v. Coughlin*, 898 F.Supp. 1019, dealt with the long-term needs of deaf prisoners throughout the entire New York state prison system, included about fifty such prisoners in its plaintiff class at any given time, and granted relief only after the state had been unresponsive to a great number of inmate requests for accommodation over periods of months or years. Chisolm, on the other hand, was placed at MCDC for a limited, short-term detention; he simply was not at MCDC long enough to require such programs as education, job training, regular medical care, or disciplinary proceedings. Under such circumstances, defendant McManimon's accommodations for Chisolm's deafness, *i.e.*, permitting the use of Chisolm's TDD and assigning Donna Walker to provide personal assistance to Chisolm far beyond what was provided to non-disabled inmates, were reasonable as a matter of law.

### III. Section 1983 Claim

Under 42 U.S.C. § 1983, an injured party may pursue a claim against a

state actor based on "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. While it is more commonly employed as a means of redressing violations of the Constitution, § 1983 by its terms also encompasses claims based on purely statutory violations of federal law. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). In the present case, Chisolm apparently bases his § 1983 claim on asserted violations of federal statutes, *i.e.,* the ADA and the Rehabilitation Act. Insofar as we have concluded that Chisolm could not persuade a reasonable factfinder of any violations of those statutes, Chisolm likewise is foreclosed from asserting any viable § 1983 claim.[6]

While it does not seem that Chisolm is advancing any § 1983 claim based on a constitutional violation, in order to construe all claims as favorably to plaintiff as possible, *see Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 286 (3d Cir.2000) (on summary judgment, evidence to be taken in light most favorable to non-movant), we will presume that he wishes to assert that his right to procedural due process was violated when he mistakenly was classified as a medium, rather than minimum, security inmate.[7] However, such a right does not arise unless some liberty interest has been curtailed, and inmates enjoy only very limited liberty interests. Thus, in *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that an inmate's placement in restrictive disciplinary custo-

---

6. We note that several courts have held that a plaintiff cannot pursue a cause of action under § 1983 for ADA or Rehabilitation Act violations because those statutes supply a comprehensive remedial scheme which would preclude the applicability of § 1983. *See Alsbrook v. City of Maumelle,* 184 F.3d 999, 1011 (8th Cir.1999) (ADA's comprehensive remedial scheme bars § 1983 claims); *Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1531 (11th Cir.1997) (plaintiff may not maintain § 1983 action in lieu of, or in addition to, Rehabilitation Act or ADA cause of action if only alleged deprivation is of rights created by Rehabilitation Act and ADA); *see also Spence v. Straw,* 54 F.3d 196, 203 & n. 3 (3d Cir.1995) (plaintiff could not maintain direct constitutional claim against federal defendants where effect would be to evade exhaustion requirements of Rehabilitation Act employment discrimination claim). *But see W.B. v. Matula,* 67 F.3d 484, 493–94 (3d Cir.1995) (§ 1983 claim can be pursued along with Rehabilitation Act claim concerning educational rights of disabled child, due to specific congressional approval of such multiple claims). However, we will not reach this question, both because the parties have not raised it and because the absence herein of any ADA or Rehabilitation Act violation makes it unnecessary to determine the applicability of § 1983 in conjunction with those statutes.

7. Chisolm points out that the information recorded by the MCDC employee who classified him was erroneous in at least two respects: (1) he was listed as unemployed, when in fact he had been employed by the Trenton post office for thirteen years; and (2) he was listed

as a "vagrant," when in fact he had lived at the same address for the previous three years. (*See* Smit Certif., Ex. F, MCDC classification sheet for Ronald Chisolm; Chisolm Dep. at 11, 59; Pl.'s Br. in Opp'n at 21–22.) Chisolm argues that these mistakes were due to the MCDC employee's inability to communicate with him. (Pl.'s Br. in Opp'n at 21–22.) Further, he contends that if the information about his employment and residence had been recorded correctly, he would have received a total classification score of under nine points, entitling him to minimum security status rather than the medium security status to which he was assigned. (*Id.; see also* McManimon Aff. ¶ 5 (explaining classification point system).)

Chisolm also asserts that he should not have been housed in the relatively more restrictive conditions of suicide watch when he first arrived at MCDC. (Pl.'s Br. in Supp. at 4.) This contention is without merit both because Chisolm admits to having had some suicidal thoughts when he was taken to MCDC, (*see* Chisolm Dep. at 10; *see also* Smit Certif., Ex. E, Psychological Evaluation of Ronald Chisolm by Richard M. Samuels, Ph. D., at 9 ("Mr. Chisolm has made more than one suicide attempt since the incident")), and because corrections officials have a paramount duty to assure the physical safety of inmates who present any possibility of harming themselves. *See, e.g., Simmons v. City of Philadelphia,* 947 F.2d 1042 (3d Cir.1991) (affirming substantial jury verdict against defendants for failing to prevent suicide of pretrial detainee).

dy implicates a liberty interest only if the change in conditions imposes an "atypical and significant hardship." *See also Duffy v. Riveland,* 98 F.3d at 457 (*Sandin* governs whether deaf inmate, allegedly denied qualified interpreter for disciplinary hearing, had liberty interest which would support valid § 1983 claim.)

In Chisolm's case, nothing in the record indicates that medium as opposed to minimum custody entailed any differences in treatment at all for MCDC inmates, let alone "atypical and significant hardship." Moreover, Chisolm was confined in medium security status for only one day, after his removal from suicide watch on September 13, 1994 until his release from MCDC on September 14, 1994. In *Sandin,* 515 U.S. at 475–76, 115 S.Ct. 2293, the Supreme Court found that even being placed in disciplinary segregation for thirty days would not be a sufficient hardship to give rise to a liberty interest. Thus, Chisolm can have no claim for a § 1983 violation based on the deprivation of a liberty interest without due process, insofar as no cognizable liberty interest was violated by Chisolm's classification in medium, as opposed to minimum, custody.

### CONCLUSION

Summary judgment in defendant's favor on Chisolm's ADA, Rehabilitation Act, and LAD claims is appropriate because any rational trier of fact would find that defendant made reasonable accommodations for Chisolm's deafness during his four-day confinement at MCDC. Summary judgment for defendant is also appropriate on Chisolm's § 1983 claim both because plaintiff has not demonstrated any violation of a federal statutory right and because the facts underlying the complaint do not reveal any atypical and significant hardship that would trigger a constitutional right to procedural due process. This action therefore will be dismissed in its entirety.