853 A.2d 288 (2004)
371 N.J.Super. 333
Robert PTASZYNSKI and Mary Ptaszynski, Plaintiffs,
v.
Ehiri UWANEME,[1] Defendant, and
Ehiri Pius and Patricia Uwaneme, individually and on behalf of Allen Ehiri and Karen Ehiri, Third Party Plaintiffs-Appellants,
v.
Robert Ptaszynski, Jeffrey Olah, Frank Salsano, Joseph Kapinos, Township of Woodbridge, and Woodbridge Police Department, Third Party Defendants-Respondents, and
Prudential Insurance Company, Third Party Defendant.
Superior Court of New Jersey, Appellate Division.
Argued March 24, 2004.
Decided July 21, 2004.
*290 Eldridge Hawkins, East Orange, argued the cause for appellants.
Christopher Killmurray, New Brunswick, argued the cause for respondent, Robert Ptaszynski (Philibosian, Russell, Killmurray & Kinneally, attorneys; Mr. Killmurray of counsel; Mr. Killmurray and Michelle G. Haas, on the joint brief).
Philip G. George argued the cause for respondent, Jeffrey Olah (Eric M. Bernstein, attorney, Warren; Mr. Bernstein and Mr. George, on the joint brief).
Lori A. Dvorak, North Brunswick, argued the cause for respondent, Frank Salsano (Lynch & Martin, attorneys; Ms. Dvorak, of counsel and on the joint brief).
Nita Raval, argued the cause for respondent, Joseph Kapinos (Sarkisian, Florio & Kenny, attorneys; Edward Florio, of counsel, Hoboken; Mr. Florio and Ms. Raval, on the joint brief).
Alan J. Baratz, Parsippany, argued the cause for respondents Township of Woodbridge and Woodbridge Police Department (Weiner & Lesniak, attorneys; Mr. Baratz, of counsel and on the joint brief).
Before Judges KESTIN, WINKELSTEIN and LARIO.
The opinion of the court was delivered by
WINKELSTEIN, J.A.D.
When four Woodridge Township (the Township) police officers responded to a domestic violence call at the home of Pius Ehiri and his wife, Patricia Uwaneme, an altercation ensued. As a result, Ehiri was indicted by a Middlesex County grand jury for fourth-degree resisting arrest, in violation of N.J.S.A. 2C:29-2a; third-degree aggravated assault on a police officer, in violation of N.J.S.A. 2C:12-1b; and second-degree disarming a law enforcement officer, in violation of N.J.S.A. 2C:12-11a; Uwaneme was indicted for fourth-degree obstructing the administration of law or other government function, in violation of N.J.S.A. 2C:29-1a. Following a jury trial (the criminal trial), Ehiri was convicted of fourth-degree resisting arrest and acquitted of the remaining charges. The charges against Uwaneme were dismissed after she completed a pretrial intervention program. See R. 3:28.
Officer Robert Ptaszynski, and his wife, per quod, filed a civil suit against Ehiri seeking damages as a result of injuries Ptaszynski sustained in the altercation, which required six months of physical therapy. He missed two weeks of work and was placed on light duty for four months. The claim settled for $32,500.
Ehiri and Uwaneme filed a third-party complaint against Ptaszynski; the other officers who responded to the call: Jeffrey Olah, Frank Salsano, and Joseph Kapinos; and the Township and its police department. Plaintiffs alleged assault and battery; wrongful arrest; malicious prosecution; *291 violations of 42 U.S.C.A. §§ 1981, 1983, 1985, 1986, and 1988; and violations of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -42(LAD). Prior to the civil trial, the judge dismissed the majority of plaintiffs' claims, including the intentional tort claims against the individual police officers, on summary judgment. On motion after plaintiffs completed their case, the court dismissed plaintiffs' remaining claims against the Township. The jury returned a verdict for defendants Salsano and Kapinos on plaintiffs' § 1983 claims, and after the jury could not reach a verdict on the § 1983 claims against Olah and Ptaszynski, the judge dismissed those claims. With the exception of the dismissal of the LAD and intentional tort claims, we affirm.
Dismissing the LAD claims on summary judgment, the judge reasoned that neither the police officers nor the police station was a place of "public accommodation" within the meaning of the LAD, and consequently, the LAD was not applicable to the officers' conduct. We reverse on that issue because we conclude that a municipal police department and the individual officers qualify as a "place of public accommodation" to support an LAD claim.

I.
Following are the facts, developed primarily during the civil trial. On July 16, 1999, at approximately 8:27 p.m., a dispatcher with the Township police department received a 9-1-1 call from plaintiffs' home in Woodbridge, during which a "hysterical and sobbing" female, presumably Uwaneme, reported that her husband had struck her, one of her children had a bloody nose, and the other "had vomit all over [her]." Olah and Salsano were dispatched to investigate; Kapinos and Ptaszynski were sent as backups.
Upon arrival, Olah and Salsano heard "a loud argument coming from inside the house." When questioned by the officers, Ehiri admitted that he and Uwaneme had been arguing. Ehiri, who is of Nigerian origin, said he and Uwaneme had been given a bottle of alcohol as a gift and Uwaneme gave it away. Because under Nigerian custom it is considered bad manners to give away a gift, Ehiri asked his wife to replace the bottle, which she did not do, so he asked her to "leave the house."
Ehiri denied striking Uwaneme. Uwaneme also testified that Ehiri had not struck her; she claimed she had called 9-1-1 solely because Ehiri had ordered her out of the house. The parties' son, Allen, then approximately six years old, said he had never seen his father hit his mother; the police report indicated that Allen had observed "his father shove his mother and knock her down."
According to Ehiri, Olah and Salsano knocked on the screen door, and rushed in as he opened it. Ehiri maintained that at that point, Karen, his three-year-old daughter, vomited on him. He also said Allen did not have a bloody nose when the police arrived; rather, he had a small amount of dried blood on his nose from an earlier bloody nose.
After speaking to Uwaneme, Salsano escorted Ehiri, who was wearing boxer shorts, to the bedroom to change. At that point, according to Ehiri, Uwaneme became upset and asked the officers not to arrest Ehiri, but instead to "just calm him down." Ehiri claimed that Olah commented that if it was "left to him ... he [would] knock all [of Ehiri's] front teeth out," at which point Salsano hit him in the head with an object later described as a police radio, knocking him unconscious. Salsano denied hitting Ehiri.
*292 Ehiri testified that when he regained consciousness, he was handcuffed, and Olah and Salsano were beating him with a "stick." Ehiri said the officers then threw him against the wall; he called for his wife, screaming, "the police are killing me." Salsano and Olah then sprayed Ehiri in the face with pepper spray, and "bounced" him into the wall. Ehiri said Olah choked him with a nightstick, taunting, "nigger [we] can kill you now." The officers again "bounced" Ehiri against the wall, kicked and beat him. Ehiri denied pushing, striking, or wrestling with the officers. Karen testified that she recalled seeing an officer "push my dad inside the wall."
According to Uwaneme, when Ptaszynski and Kapinos arrived at the residence, they ran into the bedroom, and joined in the melee. She said she tried to call for help, but Ptaszynski grabbed the phone away from her. When she ran to the back door, Ptaszynski pulled her back, kicked the door shut, punched her in the eye, and handcuffed her.
Ehiri testified that Olah, Salsano, and Kapinos escorted him outside to the patrol car. En route, Kapinos cut in front of him and said, "where [are] you from anyway you Black African monkeys," and then sprayed Ehiri with pepper spray. Ehiri was then placed into a hot patrol car, with its windows closed, for what he said was approximately twenty to twenty-five minutes. Eventually, Kapinos returned and asked Ehiri, "how you feeling man, you African monkey." When Ehiri responded, "please, I need a doctor," Kapinos replied, "oh yeah," and then "washed [Ehiri] again with pepper spray."
Upon arriving at the police station, one of the officers handcuffed Ehiri to a chair. Ten to fifteen minutes later, Salsano returned and allowed Ehiri to wash his face, instructing him not to "rub his face," but rather "[j]ust let the water run." Ehiri said when he complained to Salsano about chest pain, problems breathing, and "burning," Salsano called for medical assistance. When the ambulance arrived, Salsano advised Ehiri to wait until the "paperwork" was processed; Ehiri agreed because he said he trusted Salsano. Thereafter, Ehiri refused treatment or transportation from the first aid squad and signed a treatment refusal form. At 6:45 a.m. the following morning, while at the Middlesex County Correctional Center, Ehiri received Tylenol for a headache, but otherwise reported that he had no injuries requiring medical attention, suffered no pain or bruises, and had not suffered a head injury or lost consciousness.
Olah and Salsano gave a different account of what took place at Ehiri's residence and at the police station. They testified that upon arriving at the residence they knocked on the door, but no one answered. The officers walked in and observed that a fan and some papers had been knocked to the living room floor, a male child had a bloody nose, a younger female child had vomited, and Uwaneme was holding her eye, which appeared to be red and swollen; she was crying, and exclaimed, "[my] husband beat me" and "I want him out."
Olah testified that he accompanied Ehiri into the bedroom, asked him to get dressed, and informed him that he was under arrest. Ptaszynski entered the bedroom to assist Olah. According to both Olah and Ptaszynski, at that point, Ehiri jumped onto the bed, maintained a fighting stance, and said, "[y]ou're not arresting me in my house." Olah asked Ehiri to place his hands behind his back and, when he refused, Olah and Ptaszynski attempted to handcuff him. Ehiri broke free and started swinging his arms and kicking at them.
*293 Ptaszynski instructed Ehiri to comply with the officers' commands or they would use pepper spray. When Ehiri did not comply, Ptaszynski sprayed him; according to both officers, the spray had "little effect." Consequently, Ptaszynski attempted to use his expandable baton to subdue Ehiri, who struggled to take the baton away. Ehiri "slammed" Olah into a wall, injuring Olah's upper back and neck; Ehiri "bull rushed" Ptaszynski against the wall, breaking the sheetrock, and injuring Ptaszynski's neck and shoulder.
At the same time, Kapinos, who had remained in the dining room trying to calm the children, heard what he described as a "ruckus" in the bedroom. He entered the bedroom to assist the other officers to handcuff Ehiri. Kapinos denied using or threatening to use pepper spray on Ehiri, or striking, kicking, or hitting him.
Meanwhile, Salsano remained in the dining room speaking with Uwaneme, who appeared to be "visibly shaken." When Salsano began walking toward the bedroom to assist the other officers handcuff Ehiri, Uwaneme jumped onto his back in an effort to stop him. Salsano "rolled" Uwaneme off and handcuffed her.
Olah, Ptaszynski, and Kapinos escorted Ehiri to a patrol car, which was driven to police headquarters with the windows down to alleviate the effects of the pepper spray. At headquarters, Ehiri complained to Kapinos that his eyes hurt; however, Ehiri was "belligerent," and refused Kapinos's offer to go to the eye wash station. Subsequently, Salsano assisted Ehiri in flushing the pepper spray from his eyes.
The officers had been trained in the use of pepper spray. Even though the effects of the spray generally wore off within approximately forty-five minutes, the officers had been taught to decontaminate a sprayed suspect by exposing the suspect to the air, or by flushing the suspect's eyes with water.
On July 17, 1999, after Ehiri and Uwaneme were released on bail, Ehiri sought hospital treatment, complaining of headaches, throat pain, and difficulty swallowing; he denied having lost consciousness. The emergency room physician determined that Ehiri exhibited some tenderness in his neck, but otherwise had no signs of ecchymosis, bruising, or fractures.
Nine days later, Ehiri's primary physician found no bruising, swelling, or other signs of trauma. He prescribed Xanax for Ehiri's psychological symptoms and Ibuprofen for neck stiffness. Ehiri's psychologist concluded that Ehiri suffered from post-traumatic stress disorder as a result of his "traumatic encounter with the Woodbridge Police." His prognosis was "guarded." Defendants' psychologist, on the other hand, concluded that Ehiri did not suffer from post-traumatic stress disorder. He explained that Ehiri had scored high on a portion of a psychological test that tended to indicate that Ehiri was faking his psychological symptoms.

II.
To place the issues in proper context, we briefly summarize the procedural history of this case. On February 7, 2002, shortly prior to the trial date, defendants filed motions for summary judgment on short notice. The court heard oral argument on February 11 and February 13. On the latter date, the judge dismissed the state law intentional tort claims, the LAD claims, and the 42 U.S.C.A. §§ 1981, 1985, 1986, and 1988 claims; the claims of plaintiffs' minor children were dismissed by consent. What remained for trial were the § 1983 claims based on the officers' alleged use of excessive force, and the claims against the Township for excessive force, inadequate training and supervision.
*294 Trial on those claims was conducted before a jury in February and March 2002. At the conclusion of plaintiffs' case, defendants moved pursuant to Rule 4:37-2(b) for dismissal. Uwaneme consented to the dismissal of her excessive force claim against Kapinos, and the court granted the Township's motion to dismiss, but denied the individual officers' motions.
At the conclusion of all of the evidence, the officers moved for judgment pursuant to Rule 4:40-1. After the court reserved decision, the jury began deliberating on March 13, 2002. The following day, the jury informed the court that it could render a verdict as to some, but not all of the officers. The jury then returned a verdict in favor of Kapinos and Salsano, finding that these officers did not use excessive force during the arrest. The jury did not reach a verdict as to Olah and Ptaszynski. After the judge dismissed the jury, he granted the reserved Rule 4:40-1 motions for judgment by Olah and Ptaszynski, finding they were entitled to qualified immunity on the § 1983 claims.

III.
On summary judgment, the court dismissed plaintiffs' state law intentional tort claims against the individual police officers, for assault and battery, false arrest, false imprisonment and malicious prosecution, on the grounds that plaintiffs failed to file a notice of claim under the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to -12.3. Plaintiffs do not dispute that they did not file a notice of claim; they argue that a notice was not required for claims based on intentional conduct. They submit that because the individual police officers were not immunized from liability for intentional torts pursuant to N.J.S.A. 59:3-3 and -14, notice was not required. The trial judge disagreed; he found that claims against individual public employees for intentional torts are not exempt from the notice provision of the TCA.
In enacting the TCA, the Legislature intended to "provide a comprehensive scheme for adjudicating tort claims against public entities." Fuchilla v. Layman, 109 N.J. 319, 333, 537 A.2d 652, 659, cert. denied, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Under the TCA, "a public employee is liable for injury caused by his act or omission to the same extent as a private person." N.J.S.A. 59:3-1(a). "Included in the statutory scheme within which to assert a tort claim against a public entity are notice requirements, which are a jurisdictional precondition to filing suit." Bonitsis v. N.J. Inst. of Tech., 363 N.J.Super. 505, 516, 833 A.2d 679, 685 (App.Div.2003).
N.J.S.A. 59:8-3 provides that "[n]o action shall be brought against a public entity or public employee under [the TCA] unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter." Subject to extraordinary circumstances that may extend the time within which to file to one year, the TCA requires the filing of a notice of claim within ninety days of accrual of the claim. See N.J.S.A. 59:8-8a; N.J.S.A. 59:8-9.
The issue on appeal  whether the notice of claim requirements of the TCA apply to common law intentional tort claims  was recently addressed in Velez v. City of Jersey City, 180 N.J. 284, 850 A.2d 1238 (2004). The Court held that the notice provisions of the TCA apply to intentional, as well as negligent conduct. Id., at 292-93, 850 A.2d at 1243-44. However, concluding that the issue was one of first impression before the Supreme Court, the Court applied its ruling prospectively, "to all similar causes of action accruing after the date of this opinion." Id., at 297, 850 *295 A.2d at 1246. Consequently, because plaintiffs' causes of action accrued on July 16, 1999, the notice of claim requirements of the TCA do not apply. The motion judge's order dismissing plaintiffs' intentional tort claims is therefore reversed. Accordingly, the claims for assault and battery, false arrest, false imprisonment and malicious prosecution are reinstated.

IV.
Plaintiffs posit that the trial court erred by dismissing their LAD claims on summary judgment. They contend the police officers denied them equal treatment on the basis of their race, both in their home and while in the Township police station. They claim they were beaten and verbally abused because of their race. Because the judge found that a police department was not a place of public accommodation, he dismissed plaintiffs' LAD claims.
N.J.S.A. 10:5-4 provides, in part, that "[a]ll persons shall have the opportunity ... to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation... without discrimination because of race...." N.J.S.A. 10:5-12f(1) says that:
[i]t shall be ... unlawful discrimination ... [f]or any ... agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof ... on account of the race ... of such person....
The LAD should be construed liberally. Franek v. Tomahawk Lake Resort, 333 N.J.Super. 206, 217, 754 A.2d 1237, 1243 (App.Div.2000). Its purpose is "nothing less than the eradication of the cancer of discrimination." Dale v. Boy Scouts of Am., 160 N.J. 562, 584, 734 A.2d 1196, 1208 (1999)(quotation omitted), rev'd & remanded on other grounds, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000).
A "place of public accommodation" is defined to include,
but not be limited to: any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind; any restaurant, eating house, or place where food is sold for consumption on the premises; any place maintained for the sale of ice cream, ice and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed for consumption on the premises; any garage, any public conveyance operated on land or water, or in the air, any stations and terminals thereof; any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic or hospital; any public library; any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey....
[N.J.S.A. 10:5-5l.]
Because the more broadly this statute is applied the greater its antidiscriminatory impact, places of public accommodation are *296 not limited to those listed in the statute. Dale, supra, 160 N.J. at 585, 734 A.2d at 1208. "[T]he listed places of public accommodation are merely illustrative of the accommodations the Legislature intended to be within the scope of the statute"; public accommodations that are similar in nature to the ones included in the list are intended to be covered under the LAD. Fraser v. Robin Dee Day Camp, 44 N.J. 480, 486, 210 A.2d 208, 211 (1965).
Equally important, application of the LAD is not limited only to "places" of public accommodation. Dale, supra, 160 N.J. at 588, 734 A.2d at 1210. "To have the LAD's reach turn on the definition of `place' is irrational because `places do not discriminate; people who own and operate places do.'" Dale v. Boy Scouts of Am., 308 N.J.Super. 516, 533, 706 A.2d 270, 279 (App.Div.1998) (quoting Welsh v. Boy Scouts of Am., 993 F.2d 1267, 1282 (7th Cir.1993) (Cummings, J., dissenting)), aff'd, 160 N.J. 562, 734 A.2d 1196 (1999), rev'd & remanded on other grounds, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). Indeed, the definition of a public accommodation "has expanded from clearly commercial entities ... to membership organizations...." Dale, supra, 530 U.S. at 657, 120 S.Ct. at 2456, 147 L.Ed.2d at 568.
To help decide whether an entity qualifies as a public accommodation, courts examine "whether the entity engages in broad public solicitation, maintains close relationships with the government or other public accommodations, or whether it is similar to enumerated or other previously recognized public accommodations." Dale, supra, 160 N.J. at 589, 734 A.2d at 1210. Interaction with the public is a key factor in determining whether an entity qualifies as a public accommodation under the statute. Ibid.
For example, although not on the statutory list, places of public accommodation have been found to include: Princeton University's "eating clubs," see Frank v. Ivy Club, 120 N.J. 73, 104-05, 576 A.2d 241, 257 (1990), cert. denied, 498 U.S. 1073, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991); an incorporated swimming club, see Clover Hill Swimming Club, Inc. v. Goldsboro, 47 N.J. 25, 33, 219 A.2d 161, 165 (1966); and the Little League, see National Org. for Women, Essex County Chapter v. Little League Baseball, Inc., 127 N.J.Super. 522, 531, 318 A.2d 33, 37-38 (App.Div.), aff'd, 67 N.J. 320, 338 A.2d 198 (1974). But cf. Doe v. Div. of Youth & Family Servs., 148 F.Supp.2d 462, 496 (D.N.J.2001) (holding state agency, DYFS, not place of public accommodation because not included on list of public accommodations, N.J.S.A. 10:5-5l, and does not participate in broad public solicitation); Blair v. Mayor & Council, Borough of Freehold, 117 N.J.Super. 415, 417, 285 A.2d 46, 47-48 (App.Div.1971) (volunteer fire department not place of public accommodation because maintained for use of its members and not general public).
Although no court has directly addressed whether a police department is a place of public accommodation, the United States District Court for the District of New Jersey has predicted that the New Jersey Supreme Court would find that jails and prisons are "places of public accommodation." See Chisolm v. McManimon, 97 F.Supp.2d 615, 621-22 (D.N.J.2000), rev'd & remanded on other grounds, 275 F.3d 315 (3d Cir.2001). Chisolm also suggested that the New Jersey Supreme Court would probably agree with the Law Division in Estate of Behringer v. Medical Ctr. at Princeton, 249 N.J.Super. 597, 642-43, 592 A.2d 1251, 1274 (Law Div.1991), which held that a hospital was a "place of public accommodation." Chisolm, supra, 97 F.Supp.2d at 622.
*297 Against this background, and, perhaps to some extent, irrespective of how our courts have analyzed the meaning of a place of public accommodation for purposes of application of the LAD, we conclude that the Township police department  both the building and the individual officers  is a place of public accommodation. A municipal police force is nothing more than "an executive and enforcement function of municipal government...." See N.J.S.A. 40A:14-118. As a public entity, by its very nature a police force is a place of public accommodation.
No formulistic analysis is required to determine whether the police engage in public solicitation or a police department is similar to those entities enumerated as public accommodations under the statute. A police department is not a private entity that needs to be shoe-horned into a list of other, primarily private, entities that provide services to the public. It would indeed lead to an anomalous result if private organizations with close ties to government agencies were places of public accommodation because of those ties, while the government agency itself was not.
If a police force is not subject to the LAD, subject to certain constitutional limitations, the officers may be free to discriminate. See National Org. for Women, supra, 127 N.J.Super. at 530, 318 A.2d at 37 (finding if Little League not place of public accommodation it would be free to discriminate based on race, religion or sex). To countenance discrimination by a police force, while seeking to eradicate discrimination, for instance, in private organizations, public libraries and universities, would be both inconsistent with and contrary to the goals of the LAD.
We are satisfied that not just a municipal police force, but any State governmental agency is a place of public accommodation for purposes of inclusion under the umbrella of the LAD; and, in fact, the New Jersey Supreme Court has already said as much. In Dale, supra, the Court, while analyzing the relationship between the Boy Scouts and state and local governments, noted, without comment, the obvious: "New Jersey governmental entities are, of course, bound by the LAD." 160 N.J. at 593, n. 7, 734 A.2d at 1212, n. 7.
Accordingly, we reverse the order of the motion judge that dismissed plaintiffs' LAD claim on the grounds that the police department was not a place of public accommodation. We remand to the Law Division to consider whether substantively plaintiffs' claim that they were denied "accommodations, advantages, facilities or privileges ... on account of race," see N.J.S.A. 10:5-12f(1), survives summary judgment. We do not retain jurisdiction.
[We do not publish Part V through IX of our opinion because the guidelines for publication are not met. R. 1:36-2(d).]

X.
Affirmed in part, reversed in part, and remanded. We reinstate the intentional tort claims against the individual police officers and the LAD claims and remand to the Law Division for further action consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] Defendant's name is Pius Ehiri, not Ehiri Uwaneme or Ehiri Pius. His wife is Patricia Uwaneme. Although defendant and his wife are third-party plaintiffs vis-a-vis the remaining parties, for purposes of this opinion we will refer to them as plaintiffs, and the remaining parties as defendants.