833 A.2d 679 (2003)
363 N.J. Super. 505
T. Homer BONITSIS, Plaintiff-Appellant,
v.
NEW JERSEY INSTITUTE OF TECHNOLOGY, Alok K. Chakrabarti, Barbara Tedesco, Gary Thomas, Saul K. Fenster, Robert Avery, David L. Hawk, and Iftekhar Hasan, Defendants-Respondents/Cross-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued September 17, 2003.
Decided October 29, 2003.
*681 Kenneth W. Herbert, Leonia, argued the cause for appellant.
Ronald H. DeMaria, Morristown, argued the cause for respondents/cross-appellants (McElroy, Deutsch & Mulvaney, attorneys; Mr. DeMaria, of counsel and on the brief).
Before Judges KESTIN, AXELRAD and WINKELSTEIN.
*680 The opinion of the court was delivered by WINKELSTEIN, J.A.D.
In this public employment law case, plaintiff, an Associate Professor at the New Jersey Institute of Technology (the University), challenges the motion judge's decision to dismiss plaintiff's intentional tort claimsfor tortious interference with his contract of employment and intentional infliction of emotional distressagainst two University deans. The judge dismissed the claims because plaintiff failed to file a notice of claim under the New Jersey Tort Claims Act (Act), N.J.S.A. 59:1-1 to -12.3. Plaintiff also appeals various evidentiary rulings of the trial judge, as well as the trial judge's dismissal of plaintiff's claims against the University and its president. The jury returned a verdict of no cause of action on plaintiff's remaining claims.
Taking first plaintiff's appeal of the motion judge's dismissal of his intentional tort claims, we conclude that regardless of whether the alleged tortious conduct arose out of a want of due care or an intentional *682 act, when the public employee committed the conduct within the scope of his or her employment, compliance with the notice provisions of the Act was required. Accordingly, we affirm the motion judge's decision to dismiss the intentional tort claims.
Another of plaintiff's claims was that the deans and the University discriminated against him by failing to accommodate his physical disability. In support of that claim, plaintiff offered letters written by his treating physician to prove that plaintiff requested an accommodation for his disability in accordance with the University's policy. The trial court granted defendants' motion to preclude the evidence, finding the letters to be hearsay because the doctor who wrote the letters was not called as a witness. We disagree. Because the letters were not offered for the truth of their content, but to show that plaintiff had requested an accommodation, they were not hearsay and were admissible. Moreover, because proof that plaintiff had requested an accommodation was an essential element in plaintiff's disability accommodation cause of action, preclusion of the letters was harmful error and entitles plaintiff to a new trial on that claim.
Plaintiff's remaining arguments, as well as defendants' cross-appeal of the trial judge's denial of defendants' claim for counsel fees, are either rendered moot by our decision to grant plaintiff a new trial, or are without merit.[1]

I
Filed on December 19, 1997, plaintiff's twice amended seven-count complaint alleged that: Alok K. Chakrabarti, Dean of the School of Management, and Barbara Tedesco, Associate Dean of the School of Management, tortiously interfered with plaintiff's employment contract with the University and with plaintiff's prospective economic advantage (count one); the University, Chakrabarti and Tedesco discriminated against plaintiff based on his disability (count two); Gary Thomas, the Provost of Academic Affairs, Saul Fenster, the University President, Robert Avery, General Counsel and Executive Director of Employment Policy and Relations, and the University failed to investigate plaintiff's complaints of discriminatory and retaliatory actions (based on plaintiff's national origin and his medical disability) (count three); Thomas, Fenster, Avery, David L. Hawk, Professor of Architecture, and Iftekhar Hasan, Professor of Finance, aided and abetted Chakrabarti to destroy plaintiff's career (count four); Chakrabarti, Tedesco, Thomas, Fenster, Avery, Hawk and Hasan conspired to destroy plaintiff's career (count five); Chakrabarti intentionally caused plaintiff emotional distress (count six); and the University violated its covenant of good faith because its process for reviewing plaintiff's application was arbitrary and capricious and was contaminated by Chakrabarti's conflict of interest (count seven).
To place these issues in proper context, some extended discussion of the facts is required. Plaintiff began his employment at the University in 1984 as an Assistant Professor. In 1988, he applied for tenure and a promotion to Associate Professor. An application for tenure is first reviewed *683 by the Department Promotion and Tenure Committee (Department Committee), which, if it renders a favorable recommendation, forwards the application to the University Promotion and Tenure Committee (University Committee). That committee then votes on the application and forwards it to the President of the University, who after consulting with the Provost, makes a recommendation to the University Board of Trustees, which decides whether to accept or reject the President's recommendation. Plaintiff's 1988 tenure application was supported by the Department Committee, but rejected by the University Committee.
In the fall of 1989, plaintiff submitted a second application for tenure. Chakrabarti, the chairperson of the Department Committee, supported plaintiff's application, which the committee unanimously approved. The University Committee rejected the application, however, on the grounds that plaintiff lacked sufficient scholarship to hold the position. In response to the rejection, Chakrabarti wrote a memorandum to the University supporting plaintiff's application. Consequently, despite the rejection of plaintiff's application by the University Committee, in June 1990, plaintiff was promoted and given tenure.
Subsequently, plaintiff and Chakrabarti had a falling out concerning plaintiff's decision to terminate his work on a research grant. Plaintiff claimed Chakrabarti became "very cold and hostile" towards him, complaining about the quality of his work.
During the 1990-1991 school year, plaintiff was diagnosed with dermatomyositis, an inflammatory muscle disease characterized by skeletal muscle weakness, rashes, fatigue, blurred vision, persistent fever, and trouble swallowing food. Due to plaintiff's illness, Chakrabarti granted plaintiff's request for medical leave for the 1991 fall semester.
Upon his return to work the following semester, plaintiff wrote to Tedesco requesting accommodations for his illness. He asked for course release time and a research assistant, one period time gaps between his lectures, and that he not be required to teach three-hour lectures at night. Plaintiff asked that his lectures be held in a room with an overhead projector, and he sought a parking space closer to the lecture hall.
Thomas informed plaintiff that the school could not accommodate his requests, but he could use his sick leave if he could not return to work. Plaintiff later reiterated his requests, which Tedesco denied. Tedesco, did, however, permit plaintiff to use an overhead projector from one of the conference rooms.
While teaching during the 1992 spring term, plaintiff was fatigued to the point that by mid-afternoon he found it difficult to do his work. He stopped doing research, but continued teaching. Upon returning to work in September, he was weak, experienced rashes, intense muscle pain and fatigue, and had difficulty swallowing. He acknowledged that the quality of his teaching decreased from his illness. Chakrabarti continually reminded plaintiff that his work was not up to par and he should take sick leave.
Chakrabarti subsequently informed plaintiff that he would be required to teach four courses rather than three. When plaintiff objected, Chakrabarti told him to obtain a medical certificate to support his claim that he could not teach four courses. After plaintiff submitted a letter from his treating doctor, Francis J. Collini, M.D., the University assigned plaintiff three courses to teach for the 1993 spring semester.
*684 For the next semester, however, the University assigned plaintiff four classes to teach. As a result, he filed a grievance against Chakrabarti, in which he alleged a continuing pattern of personal and professional harassment. To review his grievance, plaintiff met with the Provost, with whom he discussed his problems with Chakrabarti and his requests for accommodations. Responding to plaintiff, the Provost said the University would attempt to accommodate plaintiff's request for one day between lectures should it become necessary to increase his teaching load.
Plaintiff later provided Avery, the University General Counsel, with a pamphlet describing the symptoms of plaintiff's disease. Avery advised plaintiff to supply a medical certification from his doctor. In response, plaintiff supplied another letter from Dr. Collini. Plaintiff's request for accommodations was not approved for the 1994 fall semester. However, for the following semester, the University gave plaintiff medical release time, and reduced his course load to three hours so he could do research.
In March 1995, after the Provost stated that plaintiff had failed to come forward with evidence to support the grievance against Chakrabarti, plaintiff filed a second grievance, which President Fenster found to be without merit.
Approximately five months after filing his second grievance, plaintiff applied for a promotion to full-time professor. He requested that Chakrabarti, who was on the seven-member committee that would review plaintiff's promotion application, recuse himself. Chakrabarti declined to do so. The committee unanimously voted against plaintiff's application. Bruce Kirchoff, a Distinguished Professor employed at the University, and a member of the committee, testified that the review of plaintiff's application was "quite rigorous" and the committee used the same criteria for plaintiff as it did for everyone else. Neither plaintiff's ethnicity nor his disability were discussed.
Later in the year, Avery compiled a list for President Fenster of complaints plaintiff had lodged against various members of the administration, and he outlined the history of plaintiff's grievances against Chakrabarti and the University's responses. As for the reason that plaintiff's request for accommodations was denied, Avery indicated that plaintiff "simply failed to secure the proper medical validation he promised detailing his need for accommodation."
Plaintiff filed a third grievance, regarding the denial of his promotion, in December 1996. Three months later, plaintiff received a letter from Avery which stated, in part, that plaintiff was failing to engage in the essential functions of his position; and he was deficient with regard to student counseling, thesis advisement, sponsored research and scholarly work. While plaintiff denied the allegations, he withdrew his third grievance.

II
We first address whether plaintiff's failure to comply with the notice provisions of the Act warranted dismissal of his intentional tort claims. Plaintiff argues that because a public employee is not immunized by the Act for intentional torts, compliance with the Act's notice provisions is not required to bring a cause of action based on an employee's intentional misconduct. We disagree.
The Act "seeks to provide compensation to tort victims without unduly disrupting governmental functions and without imposing excessive financial burden on the taxpaying public." Fuchilla v. Layman, 109 N.J. 319, 335, 537 A.2d 652 (1988) (citing *685 N.J.S.A. 59:1-2; N.J.S.A. 59:2-1 comment). It was enacted as a legislative response to the New Jersey Supreme Court's decision in Willis v. Dept. of Conservation & Econ. Dev., 55 N.J. 534, 264 A.2d 34 (1970), "which abrogated total governmental immunity from tort liability." Fuchilla, supra, 109 N.J. at 335, 537 A.2d 652. The Act, "includes redress for an `injury,' defined at N.J.S.A. 59:1-3 as death, injury to a person, damage to or loss of property or any other injury that a person may suffer that would be actionable if inflicted by a private person." Fuchilla v. Layman, 210 N.J.Super. 574, 578-79, 510 A.2d 281 (App.Div.1986), aff'd, 109 N.J. 319, 537 A.2d 652 (1988) (internal quotations omitted).
Included in the statutory scheme within which to assert a tort claim against a public entity are notice requirements, which are a jurisdictional precondition to filing suit. Williams v. Maccarelli, 266 N.J.Super. 676, 679, 630 A.2d 409 (App. Div.1993). Plaintiff concedes presuit notice is required when a claim for negligence is raised against a public employee. However, plaintiff argues the notice requirements are not applicable to a claim for relief based upon actual malice or willful misconduct, for which an employee is not immunized under the Act.
Under the Act, a public entity is not liable for intentional torts. N.J.S.A. 59:2-10. A public employee, on the other hand, "is liable for injury caused by his act or omission to the same extent as a private person," N.J.S.A. 59:3-1(a), subject to "whatever liabilities and immunities a public employee would have had at common law." Timber Props., Inc. v. Township of Chester, 205 N.J.Super. 273, 287, 500 A.2d 757 (Law Div.1984); N.J.S.A. 59:3-1(b).
The Act's immunities afforded to public employees are further circumscribed by N.J.S.A. 59:3-14, which states:
a. Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful conduct.
b. Nothing in this act shall exonerate a public employee from the full measure of recovery applicable to a person in the private sector if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct.
Against this statutory backdrop, we are asked to decide if the Act's notice provisions apply to public employees who are accused of committing intentional torts. N.J.S.A. 59:8-3 provides:
No action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter.[2]
The purposes underlying the notification requirements of the Act were set forth in the 1972 report of the Attorney General's Task Force on Sovereign Immunity, portions of which are contained in the comments to the statute.[3] The Task Force *686 Comment to N.J.S.A. 59:8-3 states that the purpose "of the claims notification requirement... is two-fold: (a) to allow the public entity at least six months for administrative review with the opportunity to settle meritorious claims prior to the bringing of suit; (b) to provide the public entity with prompt notification of a claim in order to adequately investigate the facts and prepare a defense." Id. Expanding on these purposes, the New Jersey Supreme Court in Beauchamp v. Amedio, 164 N.J. 111, 121-22, 751 A.2d 1047 (2000), explained that the goals of the Act's notice provisions are:
(1) `to allow the public entity at least six months for administrative review with the opportunity to settle meritorious claims prior to the bringing of suit'; (2) `to provide the public entity with prompt notification of a claim in order to adequately investigate the facts and prepare a defense[,]' Margolis & Novack, supra, 1972 Task Force Comment to N.J.S.A. 59:8-3; (3) `to afford the public entity a chance to correct the conditions or practices which gave rise to the claim'; and (4) to inform the State `in advance as to the indebtedness or liability that it may be expected to meet.'
[ (quoting Fuller v. Rutgers, State Univ., 154 N.J.Super. 420, 426, 381 A.2d 811 (App.Div.1977), certif. denied, 75 N.J. 610, 384 A.2d 840 (1978)) ].
Generally, the Act "is concerned essentially with tortious conduct involving fault in the sense of a want of reasonable care ...." Brook v. April, 294 N.J.Super. 90, 100, 682 A.2d 744 (App.Div.1996) (quoting Fuchilla, supra, 109 N.J. at 339, 537 A.2d 652 (Handler, J., concurring)). Accordingly, claims of negligent employee conduct require presuit notice in accordance with the provisions of the Act. Yet, not all claims of tortious conduct by public employees fall within the ambit of the Act. The Act does not apply to: (1) constitutional claims brought pursuant to the Civil Rights Act, 42 U.S.C.A. § 1983 (section 1983), see Garlanger v. Verbeke, 223 F.Supp.2d 596, 604 (D.N.J.2002) (legislature never intended to subject "constitutionally based torts, such as civil rights claims and claims for inverse condemnation, to the notice-of-claim provisions of the [Act]"); see also Seeward v. Integrity, Inc., 357 N.J.Super. 474, 484, 815 A.2d 1005 (App.Div.2003) (state law may not impede federal constitutional claim that state employee deliberately indifferent to prisoner's medical needs); (2) claims brought pursuant to the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42; see Fuchilla, supra, 109 N.J. at 338, 537 A.2d 652; or (3) a cause of action for wrongful discharge based upon the Workers' Compensation Law, N.J.S.A. 34:15-1 to -128, which prohibits discharge or discrimination against an employee in retaliation for filing a workers' compensation claim or related conduct. Brook, supra, 294 N.J.Super. at 100, 682 A.2d 744.
Although these cases do not address whether claims against public employees for intentional torts, which are neither constitutionally based nor arise out of the LAD or the Worker's Compensation Law, implicate the Act and its notice provisions, the following cases, albeit without discussion, have touched upon that issue. They imply that the notice provisions of the Act are applicable to intentional torts. See Michaels v. N.J., 955 F.Supp. 315, 325-26, 329 (D.N.J.1996) (plaintiff's claims for malicious prosecution, intentional infliction of emotional distress, abuse of process and negligent and malicious prosecutorial conduct would be dismissed for failure to comply *687 with Act's notice requirements); Picogna v. Bd. of Educ. of Township of Cherry Hill, 143 N.J. 391, 394, 404, 671 A.2d 1035 (1996) (dismissing tortious interference with contract claim because plaintiff failed to file notice of claim); Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes, 90 N.J. 582, 596, 449 A.2d 472 (1982) (nuisance action may be maintained against municipalities "under and subject to the standards of the Tort Claims Act"); Velez v. City of Jersey City, 358 N.J.Super. 224, 238-40, 817 A.2d 409 (App.Div.) (while holding claim of assault and battery outside scope of defendant's duties as "outrageous conduct" not subject to notice provisions of Act, affirming dismissal of common law actions, including intentional infliction of emotional distress, because plaintiff failed to comply with Act's notice requirements), certif. granted, 177 N.J. 224, 827 A.2d 291 (2003); Russo Farms, Inc. v. Vineland Bd. of Educ., 280 N.J.Super. 320, 325, 655 A.2d 447 (App. Div.1995) (holding notice of claim prerequisite to suit for nuisance and trespass claims against board of education), aff'd in part, rev'd in part, 144 N.J. 84, 675 A.2d 1077 (1996); Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J.Super. 337, 357, 633 A.2d 985 (App.Div.1993) (plaintiff substantially complied with Act's notice provisions by filing notice of claim prior to amending complaint to allege torts of retaliatory discharge, infliction of emotional distress, and tortious interference with economic advantage), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994).
These decisions are in accord with the comment to N.J.S.A. 59:10-4 in Margolis & Novack, supra, at 244, where the authors note, "the notice requirement [of the Act] appears to apply even where the alleged tort is entirely due to actual fraud, actual malice, willful misconduct or an intentional wrong."
They are also consistent with California precedent, where the notice requirements of the California Tort Claims Act apply to intentional torts.[4] See Tietz v. Los Angeles Unified Sch. Dist., 238 Cal.App.2d 905, 911, 48 Cal.Rptr. 245 (1965), cert. denied for lack of jurisdiction, 385 U.S. 8, 87 S.Ct. 53, 17 L.Ed.2d 7 (1966), where the court rejected the appellant's argument that the California Tort Claims Act did not require presuit notice for claims based upon intentional torts. The court, interpreting broadly California's definition of claims for money damages, found claims for both negligence and intentional torts were subject to the act's notice requirements. Ibid.
Our analysis leads to the same result for several reasons. First, under the Act, the definition of injury is "broader than [a] `negligence' type of injury." Margolis & Novack, supra, comment to N.J.S.A. 59:1-3 (citing Fuchilla, supra, 210 N.J.Super. at 578-79, 510 A.2d 281). An injury includes "death, injury to a person, damage to or loss of property or any other injury that a person may suffer that would be actionable if inflicted by a private person." N.J.S.A. 59:1-3. This definition is sufficiently broad to encompass injuries inflicted from intentional as well as negligent conduct.
Second, the statutory language of the Act's notice provisions does not distinguish between negligence claims and intentional tort claims. For example, N.J.S.A. 59:8-3 states that "[n]o action shall be brought against a public entity or public employee under this [A]ct unless the claim upon which it is based shall have been presented in accordance with the procedure *688 set forth in this chapter." (emphasis added). The phrase no action is not limited to negligence claims. Additionally, neither N.J.S.A. 59:8-4, which delineates the contents of the claim, N.J.S.A. 59:8-7, which addresses where claims are presented, nor N.J.S.A. 59:8-8, which controls the time to present claims, distinguish between negligence and other claims.
Third, to require notice for intentional acts affords the public entity an opportunity to correct the practices which gave rise to the claim, thus fostering an underlying goal of the Act's notice provisions. See Beauchamp, supra, 164 N.J. at 121-22, 751 A.2d 1047. Here, as an example, plaintiff claims intentional misconduct by two University employees. Receipt of a tort claims notice would provide the State with an opportunity to investigate the claims, and take disciplinary or other appropriate action to rectify inappropriate behavior or flawed practices, if necessary, regardless of whether the State is liable for damages.
Finally, another reason to require a tort claims notice for intentional torts is to give a public entity an opportunity to determine whether it will indemnify the employee accused of committing the inappropriate conduct. Even though the public body itself may be immune from liability, it may choose to provide the accused employee with a defense and indemnify the employee for damages, including punitive damages. See Wright v. State, 169 N.J. 422, 444-45, 778 A.2d 443 (2001); Loigman v. Bd. of Chosen Freeholders of County of Monmouth, 329 N.J.Super. 561, 564, 748 A.2d 639 (App.Div.2000); N.J.S.A. 59:10-1; N.J.S.A. 59:10-4.
In Loigman, the Freeholder Board chose to indemnify the Monmouth County Prosecutor for punitive damages, which were awarded by a federal jury in a libel case arising out of the performance of the prosecutor's duties. Id. at 562, 748 A.2d 639. We held that despite the language of N.J.S.A. 59:10-4, which purports to preclude a public entity from indemnifying for punitive damages based upon conduct which constituted "fraud, malice, willful misconduct or an intentional wrong," governmental entities have plenary authority to appropriate funds as they see fit, and absent extraordinary circumstances, courts should not review a public body's legislative policy determination. Id. at 565-66, 748 A.2d 639.
Thus, the ability of a public entity to indemnify its employee, even in the face of intentional wrongdoing, weighs in favor of presuit notice. The notice will afford the public body a six-month window to decide whether to defend and/or indemnify its employee, prepare a defense, and budget sufficient funds to pay for the defense or a subsequent judgment.
We are mindful that an argument may be made that, based on the right of a public entity to indemnify its employees, constitutional claims, claims under the LAD, and the Workers' Compensation Law should also require presuit notice. These types of claims, however, are distinguishable. No notice may apply to a section 1983 claim because "failure to satisfy the notice provisions of the Act would permit state legislation to deny a federal right in violation of the Supremacy Clause" of the United States Constitution; Fuchilla, supra, 109 N.J. at 331, 537 A.2d 652; the LAD has its own procedural requirements which include notice to the parties, see N.J.S.A. 10:5-13, 15, 16, which differ from those in the Act; Fuchilla, supra, 109 N.J. at 336, 537 A.2d 652; and application of the Act's notice requirements to the Workers' Compensation Law would interfere with the Legislature's decision "to provide assured compensation to employees for work-connected injuries according to an *689 established schedule." Brook, supra, 294 N.J.Super. at 98-99, 682 A.2d 744. None of these considerations are applicable to the intentional torts that plaintiff alleges in this casetortious interference with his contract rights and intentional infliction of emotional distress.
For these reasons, because plaintiff failed to file a tort claims notice for his intentional tort claims, we affirm the Law Division judge's dismissal of those claims (count one).

III
We now turn to plaintiff's argument that the trial court erred when it barred as hearsay letters written by Dr. Collini regarding plaintiff's illness because Dr. Collini was not called as a witness. Plaintiff initially argued that the letters were admissions of a party-opponent, and exceptions to the hearsay rule. See N.J.R.E. 803(b). However, plaintiff later asserted that the letters were not hearsay because they were not offered for their truth, but instead were offered to show that plaintiff complied with the University's policy of requiring medical documentation to support his request for a disability accommodation.
The excluded documents, all prepared by Dr. Collini, stated the following:
Note dated September 4, 1991:
[Plaintiff] is under medical supervision and treatment and CANNOT WORK THIS SEMESTER.
Letter dated December 14, 1992:
Professor T. Homer Bonitsis is currently under medical supervision and treatment for a rare idiopathic myopathy. Consequently, an increase in Professor Bonitsis' teaching and/or work load is not medically prudent at this time, for it would probably result in a deterioration in his medical condition.
Letter dated January 18, 1995:
Prof. T. Homer Bonitsis is under an aggressive therapy for dermatomyositis.... Daily tasks may result in significant muscle discomfort.... It is medically advisable that he avoids stress, rests and does not stand for prolonged periods. It is medically advisable that he substantially reduces his work activity for the next six to nine months....
Letter dated December 8, 1995:
At present, [plaintiff] is able only to work his present day schedule plus only one (1) night session. Any increase in work hours will result in a severe exacerbation of his disease, which will require more powerful immune suppressive drugs, which can have lethal side effects. It is because of this he is restricted to the above hours of work.
Letter dated December 18, 1996:
Any increase in work activity, even minor, is not medically advisable....
"Traditional rules of appellate review require substantial deference to a trial court's evidentiary rulings." Benevenga v. Digregorio, 325 N.J.Super. 27, 32, 737 A.2d 696 (App.Div.1999) (quoting State v. Morton, 155 N.J. 383, 453, 715 A.2d 228 (1998)), certif. denied, 163 N.J. 79, 747 A.2d 287 (2000). To reverse the trial court's evidentiary ruling, we must find that the trial judge's decision was clearly capable of producing an unjust result. R. 2:10-2.
N.J.R.E. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." However, "where statements are offered not for the truthfulness of their contents, but only to show that they were in fact made and that the listener took certain action as a result thereof, the statements are not inadmissible *690 hearsay." Spragg v. Shore Care, 293 N.J.Super. 33, 56, 679 A.2d 685 (App.Div. 1996). Equally important, hearsay rules do not apply to undisputed facts. N.J.R.E. 101(a)(4); State v. Neal, 361 N.J.Super. 522, 534, 826 A.2d 723 (App.Div.2003).
Here, the court found that the letters pertained to whether plaintiff's medical condition affected his ability to work. Consequently, because their author was not called as a witness, the judge excluded the letters as hearsay. However, the parties stipulated that plaintiff suffered from dermatomyositis, a serious disease that affected his ability to work. Also, defendants did not contest the testimony of Dr. Harry Bienenstock, plaintiff's expert witness, that patients with dermatomyositis, like plaintiff, have difficulty "walking, standing[,] ... holding their heads in place." Said another way, there was no dispute that plaintiff suffered from a serious medical condition which would adversely affect his ability to work.
Equally important, to prove discrimination based upon defendants' failure to accommodate his disability, plaintiff was required to establish that he requested assistance for his disability. Tynan v. Vicinage 13 of Super. Ct., 351 N.J.Super. 385, 400, 798 A.2d 648 (App.Div.2002). "While there are no magic words to seek an accommodation, the employee ... `must make clear that ... assistance [is desired] for his or her disability.'" Ibid. (quoting Jones v. United Parcel Serv., 214 F.3d 402, 408 (3d Cir.2000)). Dr. Collini's letters bear directly on this issue.
Even assuming that the letters had a hearsay component, when a statement has both an impermissible hearsay aspect and a permissible non-hearsay aspect, a court should generally "admit such evidence with a limiting instruction, unless the probative purpose of the statement is substantially outweighed by the danger of its improper use." Spragg, supra, 293 N.J.Super. at 57, 679 A.2d 685. By offering the letters, plaintiff did not seek to show the nature and seriousness of his medical disabilitythat issue was not in dispute. Rather, he wanted to show that he requested the accommodation and documented his request in response to both Chakrabarti's and the Provost's requests. In short, the letters had a non-hearsay use, and should have been admitted into evidence with a limiting instruction.
The importance of the letters was illustrated in defense counsel's closing argument. Although plaintiff testified that he submitted medical proof to the University, the defense stressed in its closing that the record did not contain any written proof, implying that plaintiff never submitted documentation to support his claim. The excluded documents were therefore crucial to that component of plaintiff's cause of action.
As a consequence, because the excluded evidence was critical to plaintiff's disability accommodation claim, the omission of Dr. Collini's letters was clearly capable of producing an unjust result. Accordingly, plaintiff is entitled to a new trial on that claim.

IV
Next, we turn to plaintiff's argument that the trial court erred by granting defendants' motion to dismiss plaintiff's claim against the University that the promotion process was arbitrary and capricious. The trial court stated:
[I]n order to be arbitrary and capricious an action of a public agency must be without ... any rational basis. It must be unreason[ed] action and it seems to me, in this case, the University has come forward with the evidence that its Promotion and Tenure Committee *691 deemed [plaintiff's] scholarly research to be inadequate to warrant his promotion to position as Full Professor. That, in the Court's view, is a rational basis for its decision.
The Court would not allow the Jury to reconsider or second guess the decision of the Promotion and Tenure Committee or the President of the University and that, seems to me, is precisely what you're asking the Courtthe Jury to do in this case....
* * *
The decision ... ought to be addressed by the academics in this case. It's not an issue of fact for a Jury to be deciding....
These findings are fully supported by the record. Plaintiff failed to present evidence sufficient to support a judgment in his favor on his claim that the University acted arbitrarily when it denied his application for full professor. See R. 4:37-2(b). Seven faculty members reviewed plaintiff's application and unanimously voted to deny him a promotion. The evidence showed that plaintiff was not "promotable" to a full professor position because he had only a minimal number of publications and their quality was considered inadequate. According to Professor Kirchoff's essentially unrefuted testimony, the promotion committee's deliberations were "rigorous" and the committee did not discuss plaintiff's handicap or his ethnicity. Aside from plaintiff's unsupported claims that the promotion committee was biased and that the University failed to follow its own policies, we find no evidence to raise a factual dispute for the jury that the committee acted arbitrarily in considering plaintiff's application. Cf. Dixon v. Rutgers, The State Univ. of N.J., 110 N.J. 432, 463, 541 A.2d 1046 (1988) (judiciary should abstain from supervising academic decisions) (O'Hern, J., concurring); Snitow v. Rutgers Univ., 103 N.J. 116, 122, 510 A.2d 1118 (1986) (peer review system in most public universities is the "most reliable method for assuring promotion of candidates best qualified to serve the needs of the institution.") (internal quotation omitted).

V
We dispose of plaintiff's remaining arguments with little discussion. Plaintiff argues that the trial court erred in dismissing his claim that the University President, Saul Fenster, aided and abetted other faculty members to discriminate against him. In dismissing the claim, the judge said: "I think the evidence is completely inadequate to establish that President Fenster engaged in actions that substantially assisted in any unlawful action on the part of the University with regard to the... handicap accommodations. I don't think there's enough evidence to warrant a claim against him personally." We agree.
N.J.S.A. 10:5-12(e) states that it is an unlawful employment practice for any person, "whether an employer or an employee... to aid, abet, incite, compel or coerce" discriminatory conduct against an employee. When determining whether a supervisor has aided and abetted the discriminatory conduct of the employer, a factfinder must find that the supervisor gave substantial assistance or encouragement to the unlawful conduct of the employer. See Herman v. Coastal Corp., 348 N.J.Super. 1, 27, 791 A.2d 238 (App.Div.), certif. denied, 174 N.J. 363, 807 A.2d 195 (2002).
Here, plaintiff's "proofs" purporting to implicate President Fenster were nothing more than speculation. Plaintiff contends that because his application for accommodation "did not proceed through normal *692 channels but was sent directly to the Provost and President, there was some ulterior motive or special set of circumstances that was at work to undermine [p]laintiff's application." He states that the ultimate decision to initially deny him his medical accommodations "emanated" from Fenster. Plaintiff, however, has presented no evidence to support a reasonable inference that Fenster gave substantial assistance or encouragement to any faculty member's efforts to deny plaintiff his disability accommodations or a promotion to full professor.
Next, plaintiff asserts that he was discriminated against based on his national origin (Greek). The jury entered a no cause of action verdict on that claim. We affirm. To support this claim, plaintiff offered evidence of alleged anti-Semitic comments made by one of the defendants. We find no abuse of discretion by the trial judge who excluded this evidence. Plaintiff's arguments addressing this issue are without merit. See R. 2:11-3(e)(1)(E).
Plaintiff also claims the trial judge erred by improperly excluding evidence of how the University addressed requests for medical accommodations by others; by failing to provide the jury with an adverse inference charge when four defendants failed to testify; and by denying plaintiff's motion for a directed verdict regarding his disability accommodation claim. These arguments are moot in light of our decision to afford plaintiff a new trial for the latter claim.
Plaintiff, and defendants (in their cross-appeal), each claim the trial court erred by refusing to award counsel fees. We affirm, finding no abuse of discretion. See K.D. v. Bozarth, 313 N.J.Super. 561, 574, 713 A.2d 546 (App.Div.), certif. denied, 156 N.J. 425, 719 A.2d 1023 (1998); R. 2:11-3(e)(1)(E).

VI
In summary, we reverse and remand for a new trial on plaintiff's disability accommodation claim against the University, Chakrabarti, and Tedesco consistent with this opinion. In all other respects, we affirm the dismissal of the remaining counts of the complaint.
Affirmed in part and reversed in part.
NOTES
[1] Defendants in their cross-appeal also challenge "that portion [of the September 28, 2001 order] which denied defendants' request for a complete summary judgment." Defendants have, however, only briefed the counsel fees issue. Therefore, any other issues raised in the cross-appeal are waived. See In re Bloomingdale Convalescent Ctr., 233 N.J.Super. 46, 48 n. 1, 558 A.2d 19 (App.Div.1989); Pressler, Current N.J. Court Rules, comment on R. 2:6-3 (2004).
[2] N.J.S.A. 59:8-3 was amended in 1994 to include the phrase "public employee." L. 1994, c. 49, § 2, eff. June 23, 1994. Prior to the effective date of the amendment, notice was only required to maintain a suit against the public entity. See Chatman v. Hall, 128 N.J. 394, 403, 608 A.2d 263 (1992) (notice-of-claim provisions of the Act do not apply to public employees).
[3] This commentary has "the precedential value and weight of legislative history." Margolis & Novack, Claims Against Public Entities (Gann, 2003) (Introduction and Overview, p. ix) (citing Rochinsky v. State Dept. of Transp., 110 N.J. 399, 407 n. 3, 541 A.2d 1029 (1988)).
[4] California precedent is considered "particularly persuasive ... because the New Jersey Tort Claims Act was patterned after the California Tort Claims Act of 1963." Fuchilla, supra, 109 N.J. at 331, 537 A.2d 652.