925 A.2d 106

BRIAN SCOTT OWENS, SR., AND SHANNON EILEEN OWENS, HUSBAND AND WIFE, AS INDIVIDUALS, AS GUARDIANS AD LITEM FOR THEIR MINOR CHILDREN, BRIAN SCOTT OWENS, JR., B. MONTANA OWENS, AND LANE FINLEY OWENS, AS GENERAL ADMINISTRATORS OF THE ESTATE OF MATTHEW OWENS, AND AS ADMINISTRATORS AD PROSEQUENDUM FOR THE ESTATE OF MATTHEW OWENS, DECEASED, PLAINTIFFS–APPELLANTS, v. GERALD FEIGIN, M.D., DEFENDANT–RESPONDENT, AND WILLIAM D. BOLLETINO, JR., WILLIAM D. BOLLETINO, SR., SUSAN D. BOLLETINO, THEODORE WOODSIDE, WOODSIDE FUNERAL HOME, HONDA NORTH AMERICA, INC., DEFENDANTS.[1]

Superior Court of New Jersey
Appellate Division

Telephonically Argued February 15, 2007—Decided June 21, 2007.

---

[1] The record does not reveal the disposition of the claims against the other defendants.

Before Judges KESTIN, WEISSBARD and GRAVES.

*Clifford L. Van Syoc* argued the cause for appellants (*Van Syoc Chartered,* attorneys; *Sebastian B. Ionno,* on the brief).

*Maureen Le Pochat* argued the cause for respondent (*Tressler, Soderstrom, Maloney & Priess,* attorneys; *Ms. Le Pochat* and *Mark R. Vespole,* on the brief).

The opinion of the court was delivered by

WEISSBARD, J.A.D.

This interlocutory appeal presents the narrow, but important, question of whether the notice requirements of the Tort Claims

Act (TCA), *N.J.S.A.* 59:1–1, apply to claims asserted under the New Jersey Constitution and the New Jersey Civil Rights Act of 2004(CRA), *N.J.S.A.* 10:6–2. We conclude that the TCA does not apply. As a result, the dismissal of plaintiffs' action must be reversed.

The limited nature of the issue before us makes it unnecessary to set out the details of plaintiffs' complaint, in which the "facts" underlying the several causes of action were set out in ninety-eight numbered paragraphs. It suffices for our purposes to note that plaintiffs' claims arose out of the tragic and untimely death of thirteen-year-old Matthew Owens on February 9, 2005. Defendant, Dr. Feigin was the medical examiner in Salem County and performed an autopsy on Matthew's body the day following his death. He concluded that the manner of death was "natural," caused by "cardiac arrhythmia" resulting from "congenital malformation of the left anterior descending coronary artery." Plaintiffs contend, however, that defendant "unilaterally botched the autopsy to help cover for a state trooper who was allegedly trying to avoid liability in connection with the decedent's death." In fact, Matthew collapsed while at the home of a friend whose father was the state trooper in question.

On January 22, 2006, slightly less than a year after Matthew's death, his parents, plaintiffs Brian and Shannon Owens, filed a Notice of Tort Claim (Notice) directed to the "New Jersey Department of Law and Public Safety, Division of State Police," and the "New Jersey Department of Law and Public Safety, Division of Consumer Affairs, New Jersey State Board of Medical Examiners." The Notice contained considerable detail, and with respect to defendant Feigin, stated the following:

Furthermore, based upon the conclusions reached by independent experts, information and belief, Brian and Shannon Owens believe that Gerald Feigin, M.D. conducted a deficient autopsy, lacking in detail and specificity, failing to search for all possible causes of Matthew Owens' death. Upon information and belief, Claimants believe that Dr. Feigin knew or should have known that Matthew Owens did not die of a congenital heart defect but of a separate and identifiable cause which demonstrated that he had suffered an injury at the home of, or while under the supervision of [State Trooper] Bolletino. Upon information and belief, Claim-

ants believe that, for reasons unknown to Claimants at this time, Dr. Feigin acted to protect those who were potentially responsible for that death by issuing a false opinion and/or disposing of the brain stem, cerebellum and a part of the cerebrum. Whether acting alone or in concert with Trooper Bolletino and/or others, these acts and omissions resulted in preventing Mr. and Mrs. Owens from ascertaining the actual cause of the death of their son. Furthermore, this false and misleading finding has caused them additional distress, as they have been greatly concerned about the health of their three surviving sons and the possibility of them suffering the same fate as Matthew's, had Matthew actually had a congenital heart defect.

Plaintiffs' complaint was filed on February 9, 2006. It contained eight counts asserting the following claims: "negligence, recklessness, willful, wanton, intentional and malicious conduct" by all defendants except Honda Corporation (count one); defective product liability against Honda (count two); violation of plaintiff's civil rights under the CRA (count three); violation of the Consumer Fraud Act by certain defendants (count four); "emotional distress under circumstances of outrage" against all defendants other than Honda (count five); "suppression and spoliation" of evidence by defendants other than Honda (count six); loss of companionship (count seven); wrongful death (count eight).

Feigin moved to dismiss the complaint based upon plaintiffs having failed to file a Notice against him. That motion was granted by order of May 12, 2006, which also dismissed the wrongful death claims of all plaintiffs except the named administrator ad prosequendum. In granting the motion, the judge rendered a thoughtful and lengthy oral opinion, relying primarily on *Velez v. City of Jersey City*, 180 *N.J.* 284, 850 *A.*2d 1238 (2004). Plaintiffs sought leave to appeal, which we denied on June 28, 2006. However, on September 21, 2006, the Supreme Court granted plaintiffs' motion for leave to appeal and summarily remanded the matter for us "to consider the appeal on the merits."

As we noted, plaintiffs' Notice was filed well beyond the ninety days allowed by the statute. *N.J.S.A.* 59:8–8. Further, plaintiffs never moved within the time allowed to file a late Notice. *N.J.S.A.* 59:8–9. Most importantly, the Notice was not directed to or served upon Feigin, the Salem County Medical Examiner's Office

or Salem County. Thus, if the TCA notice requirements were applicable, plaintiffs' complaint was properly dismissed, including the count alleging violation of the CRA.

On appeal, plaintiffs argue that the TCA notice provisions do not apply to claims under our State Constitution or the CRA, while defendant contends that those time strictures do apply. No New Jersey decision has directly addressed this issue.

We begin our analysis by quoting the CRA, in relevant part:

c. Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief. The penalty provided in subsection e. of this section shall be applicable to a violation of this subsection.

d. An action brought pursuant to this act may be filed in Superior Court. Upon application of any party, a jury trial shall be directed.

[*N.J.S.A.* 10:6–2.]

Three Supreme Court cases are relevant to our inquiry, the most pertinent of which is *Fuchilla v. Layman,* 109 *N.J.* 319, 537 *A.*2d 652, *cert. denied sub nom., Univ. of Med. and Dentistry v. Fuchilla,* 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988). There, the Court affirmed our determination that the notice provision of the TCA does not apply to the New Jersey Law Against Discrimination (LAD). The Court's analysis began with the recognition that there is a clear, strong "public policy of this State[,] [which] is to abolish discrimination in the work place." *Id.* at 334, 537 *A.*2d 652. "In contrast to the sweep of the [LAD], the [TCA] seeks to provide compensation to tort victims without unduly disrupting governmental functions and without imposing excessive financial burden on the taxpaying public." *Id.* at 335, 537 *A.*2d 652. The Court continued that "[w]ith their contrasting backgrounds in mind, ... the history, purpose, and text of each statute[ ]" must be analyzed. *Ibid.*

First, the Court explained that, "[a]s a historical matter, the [TCA] is the legislative response to th[e] Court's decision in *Willis v. Dep't of Conservation & Econ. Dev.,* 55 *N.J.* 534, 264 *A.*2d 34 (1970), which abrogated total governmental immunity from tort liability." *Fuchilla, supra,* 109 *N.J.* at 335, 537 *A.*2d 652. "According to the [TCA's] stated purpose, it is 'the public policy of this state that public entities shall only be liable for their negligence within the limitations of this Act.' " *Ibid.* (quoting *N.J.S.A.* 59:1–2). However, "[t]hat declaration pertaining to negligent conduct sheds little light on the Legislature's intention concerning discrimination, which depends on proof of motive or intent." *Ibid.* Thus, the Court concluded that "[t]he difference between the substantive standard for negligence, which was clearly a legislative concern in the [TCA], and the [LAD's] implicit emphasis on motive or intent suggests that the Legislature did not intend that the [TCA] apply to discrimination claims under the [LAD]." *Ibid.*

Second, in terms of procedure, the Court contrasted the relatively short (ninety day) period for filing a Notice under the TCA with the LAD, wherein "an aggrieved person may either file an administrative complaint with the Director of the Division on Civil Rights or file a civil action in the Superior Court." *Ibid.* In addition, the Court emphasized the LAD's procedural provisions: requiring notice to the Division and parties, *N.J.S.A.* 10:5–13, 15; conciliation, *N.J.S.A.* 10:5–14; and time limitation on actions, *N.J.S.A.* 10:5–18. *Ibid.* However, "[t]hese procedural provisions pertain only to administrative actions before the Division ... and ... do not apply to civil actions in the Superior Court." *Ibid.* (internal citations omitted.) Essentially, the LAD has "no limitations or other procedural requirements for claimants who elect to proceed in the Superior Court." *Ibid.*

Third, the Court determined that "the 1977 amendment [to the LAD] extending the definition of 'employers' to include public entities, *N.J.S.A.* 10:5–5(e), reflects the Legislature's intention to subject those entities to the procedures of the [LAD]." *Id.* at 336–37, 537 *A.*2d 652.

Finally, the Court commented on the "manner in which each [statute] addresses damages." *Id.* at 337, 537 *A.*2d 652. The TCA "prohibits the award of damages for pain and suffering, except 'in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $ 1,000.00.'" *Ibid.* (quoting *N.J.S.A.* 59:9–2(d)). Thus, a TCA "claimant may not recover ... for 'the intangible, subjective feelings of discomfort that are associated with personal injuries.'" *Ibid.* (quoting *Ayers v. Jackson Twp.,* 106 *N.J.* 557, 571, 525 *A.*2d 287 (1987)). By contrast, the LAD "does not prohibit damages for pain and suffering." *Ibid.* The Court explained that the "[a]wards under the [LAD] are intended to serve not only the interest of the individual involved but 'it is plain that the public interest is also involved.'" *Ibid.* (quoting *Jackson v. Concord Co.,* 54 *N.J.* 113, 124–25, 253 *A.*2d 793 (1969)).

The second decision of interest is *Greenway Dev. Co. v. Borough of Paramus,* 163 *N.J.* 546, 557, 750 *A.*2d 764 (2000), in which the Court held that "the notice provision of the TCA does not apply to inverse condemnation claims alleging, in a state court proceeding, a violation of the Just Compensation Clause of the Fifth Amendment." The Court concluded that the "constitutional prohibition against unconstitutional takings is self-executing, in the sense that such claims arise independently of the TCA." *Id.* at 558, 750 *A.*2d 764. It went on to note that "[a]dditionally, 'statutes [cannot] abrogate constitutional rights.'" *Ibid.* (citation omitted.) The Court relied on *Felder v. Casey,* 487 *U.S.* 131, 108 *S.Ct.* 2302, 101 *L.Ed.*2d 123 (1988), which "held that a state's notice of claim provision in a tort claims act does not apply to an action brought in state court alleging violations of federal constitutional rights under 42 *U.S.C.A.* § 1983." *Greenway, supra,* 163 *N.J.* at 558, 750 *A.*2d 764. The Court noted, however, that "[e]ven before *Felder* was decided, [it] had held that the notice provision of the TCA did not apply to a Section 1983 claim." *Ibid.* (citing *Fuchilla, supra,* 109 *N.J.* at 337–38, 537 *A.*2d 652). Additionally, the Court took note of "[o]ther courts [that] have similarly interpreted *Felder* to render state notice-of-claim laws inapplicable in actions

alleging violations of federal as well as state constitutional rights, such as claims of inverse condemnation." *Ibid.* (citing *Moore Real Estate, Inc. v. Porter County Drainage Bd.*, 578 *N.E.*2d 380 (Ind.Ct.App.1991); *Wolff v. Sec'y of S.D. Game, Fish & Parks Dep't*, 544 *N.W.*2d 531 (S.D.1996)). Moore held that a state governmental agency may not use a tort claims act to trump the constitutional rights of a land owner to compensation for a constructive taking. *Ibid.* Similarly, *Wolff* held "that [an] inverse condemnation claim 'is not grounded in tort' but 'proceeds from a [state] constitutional right,' and thus, 'under the explicit provisions of [the South Dakota Constitution, requires] no notice of injury.'" *Ibid.* (quoting *Wolff, supra,* 544 *N.W.*2d at 535.) *Wolff* "refus[ed] to apply tort notification requirements to [a] Section 1983 claim...." *Ibid.* Thus, *Greenway* concluded that "[a] public entity may not use a state statute, such as the TCA, to abrogate a claimant's constitutional rights." *Ibid.*

Finally, in *Velez v. City of Jersey City, supra,* 180 *N.J.* at 296, 850 *A.*2d 1238, the case relied upon by the motion judge, the Court held that the notice provisions in the TCA apply to causes of action based on the intentional conduct of a public employee. In so holding, the Court adopted our analysis in *Bonitsis v. New Jersey Inst. of Tech.,* 363 *N.J.Super.* 505, 833 *A.*2d 679 (App.Div. 2003). *Velez, supra,* 180 *N.J.* at 293, 850 *A.*2d 1238. The Court explained that, in *Bonitsis,* "the plaintiff filed a complaint asserting claims for tortious interference with his employment contract and for intentional infliction of emotional distress against two supervisors." *Id.* at 292, 850 *A.*2d 1238. However, the "plaintiff failed to comply with the [TCA's] notice provisions and the trial court dismissed his complaint." *Ibid.* "On appeal, the [Appellate Division] affirmed the dismissal and concluded that New Jersey law implies 'that the notice provisions of the [TCA] are applicable to intentional torts.'" *Ibid.* (quoting *Bonitsis, supra,* 363 *N.J.Super.* at 519, 833 *A.*2d 679). "The panel noted that New Jersey case law is consistent with current commentary stating that 'the notice requirement[s] [of the TCA] appear[ ] to apply even where

the alleged tort is entirely due to actual fraud, actual malice, willful misconduct or an intentional wrong.'" *Ibid.* (quoting *Bonitsis, supra,* 363 *N.J.Super.* at 520, 833 *A.*2d 679).

"The [*Bonitsis* Appellate Division] panel listed four persuasive reasons for its conclusion that the Act's notice provisions apply to intentional tort claims." *Ibid.* The first reason involved the definition of the term "injury," in *N.J.S.A.* 59:1-3, which is "broad enough to encompass injuries inflicted from intentional as well as negligent conduct." *Ibid.* Second, the panel continued that "the express language of the notice provisions do not distinguish between negligence claims and intentional torts." *Ibid.* "Rather, the [TCA] 'states that [n]o action shall be brought against a public entity or public employee under [the TCA] unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter.'" *Id.* at 292–93, 850 *A.*2d 1238. (citations omitted.) "Third, the panel found that requiring notice in actions against a public employee is consistent with the purpose of the notice provisions, allowing a public entity an opportunity to correct the practices giving rise to the claim." *Id.* at 293, 850 *A.*2d 1238. Further, *Bonitsis* found that "proper notice would provide a public entity 'with an opportunity to investigate the claims, and take disciplinary or other appropriate action to rectify inappropriate behavior or flawed practices, if necessary, regardless of whether the [public entity] is liable for damages.'" *Ibid.* (citation omitted.) "Finally, the panel reasoned that requiring notice would 'give a public entity an opportunity to determine whether it will indemnify the [accused] employee' despite the fact that it may be immune from liability." *Ibid.* (quoting *Bonitsis, supra,* 363 *N.J.Super.* at 521, 833 *A.*2d 679). In addition to the cited reasoning from our opinion, the Court explained that its interpretation of the TCA furthers the statutes "two central purposes: (1) restricting a public entity's liability in tort, and (2) creating a relatively short notice filing period 'so [a public entity can] investigate and settle claims.'" *Id.* at 294, 850 *A.*2d 1238 (quoting *Fuchilla, supra,* 109 *N.J.* at 336, 537 *A.*2d 652).

Moreover, the Court continued that its holding was "consistent with prior cases in which courts have concluded that the [TCA's] notice requirements apply to conduct that arguably could be classified as the intentional or outrageous conduct described in *N.J.S.A.* 59:3–14." *Id.* at 294–95, 850 *A.*2d 1238 (citing *Epstein v. State,* 311 *N.J.Super.* 350, 355–56, 709 *A.*2d 1353, (App.Div.)) (barring "claims for malicious prosecution, libel, slander, defamation, and emotional distress due to failure to file timely notice of claim with local public entities"), *certif. denied,* 155 *N.J.* 589, 715 *A.*2d 992 (1998); *Dunn v. Borough of Mountainside,* 301 *N.J.Super.* 262, 275–76, 693 *A.*2d 1248 (App.Div.1997) (noting that "under post–1994 Act, plaintiff's sexual assault claim against police officer would be barred due to failure to file timely notice of claim"), *certif. denied,* 153 *N.J.* 402, 709 *A.*2d 795 (1998); and *Pisano v. City of Union City,* 198 *N.J.Super.* 588, 590, 487 *A.*2d 1296 (Law Div.1984) (holding "that claims of false arrest and false imprisonment must be presented to public entities within ninety days after accrual and are barred by the [TCA] after two years have lapsed"). The Court also cited *Garlanger v. Verbeke,* 223 *F.Supp.*2d 596, 602 (D.N.J.2002), in which the District Court found the TCA's "notice requirement applicable to claims for intentional infliction of emotional distress," and *Rolax v. Whitman,* 175 *F.Supp.*2d 720, 730 (D.N.J.2001), in which the District Court found the "Act's notice requirement applicable to a battery claim." *Velez,* 180 *N.J.* at 295, 850 *A.*2d 1238.

On the other hand, the Court explained that "in limited circumstances, [it] has held that the [TCA's] notice requirements are inapplicable to tort actions against a public entity or a public employee." *Ibid.* In discussing *Greenway,* the Court explained that that case "held that because inverse condemnation is not an 'injury' within the meaning of the [TCA], the notice provisions were not applicable," *id.* at 296, 850 *A.*2d 1238, and that "even if inverse condemnation were an injury, '[a] public entity may not use a state statute, such as the [TCA], to abrogate a claimant's constitutional rights.'" *Ibid.* (quoting *Greenway, supra,* 163 *N.J.*

at 557–58, 750 *A.2d* 764). Significantly, in distinguishing *Velez* from those earlier cases, the Court explained:

> [U]nlike the LAD claims in *Fuchilla* the tort claims at issue here are not statutory causes of action with specific procedural requirements and greater damage allowances than available at common law. Nor do the claims assert any state or federal constitutional rights that would supercede statutory limitations, such as in *Greenway*. Instead, these claims are basic common law tort claims, and we find no justification to conclude that the Legislature intended to exclude them from the [TCA's] notice requirements.
>
> [*Ibid.*]

It is against this background that we approach resolution of the controversy at issue on this appeal.[2] While the present case does not fit neatly into the *Fuchilla* framework, we conclude that a consideration of the fundamental principles undergirding that decision lead to a similar result here. At the outset, it must be acknowledged that part of the Fuchilla Court's reasoning, which led to its conclusion excepting the LAD from TCA notice requirements, is now invalid. Insofar as the Court held that the two statutes are dissimilar because the LAD involves only intentional conduct and the TCA only negligence, *Velez* has removed that dissimilarity. That said, we are nonetheless persuaded that the similarities qualitatively outweigh the differences.

While it is true that, unlike the LAD, the CRA does not embody its own set of procedural requirements, it is clear, insofar as private plaintiffs are concerned, that the statute extends well beyond traditional negligence-based tort concepts. In addition to "normal" damages, the CRA provides for a civil penalty for each violation, the amount to be determined by the jury, *N.J.S.A.* 10:6–2e, as well as "reasonable attorney's fees and costs" to the prevailing party. *N.J.S.A.* 10:6–2f. And while CRA violations are

---

[2] We note two trial court opinions that have also addressed this issue. In *Garlanger v. Verbeke, supra,* 223 *F.Supp.*2d at 604, Judge Brotman, after reviewing *Fuchilla* and *Greenway,* concluded that the TCA did not apply to claims of "constitutionally based torts, such as civil rights claims." In *Estate of McGrath v. N. Jersey Dist. Water Supply Com.,* 224 *N.J.Super.* 563, 570, 540 *A.2d* 1350 (Law Div.1986), the Law Division stated, without analysis or discussion, that the TCA does not apply to a cause of action based on "violation of civil rights."

intentional acts, and *Velez* deemed intentional torts subject to the TCA, we are influenced by the Court's dictum in that case, quoted earlier, that the claims at issue in *Velez* did not "assert any state or federal constitutional rights that would supercede statutory limitations." *Velez, supra,* 180 *N.J.* at 295, 850 *A.*2d 1238. We recognize that *Greenway* may be distinguished because the claim there, for just compensation, arose directly from a specific constitutional provision and not from a statute, such as the CRA.[3] However, we do not find the distinction persuasive, particularly because the rights protected by the CRA also emanate from the federal or state constitutions.

■ Defendant relies on Governor McGreevey's Statement accompanying his signing of the CRA into law, wherein he said that the statute was not intended to "waive immunities or alter jurisdictional or procedural requirements including those established by the Rules Governing the Courts of the State of New Jersey. . . ." While we recognize that an Executive Statement may "offer reliable aid in determining legislative intent," *State v. Sutton,* 132 *N.J.* 471, 483, 625 *A.*2d 1132 (1993) (citing *Oswin v. Shaw,* 129 *N.J.* 290, 308, 609 *A.*2d 415 (1992)), we do not find the Governor's Statement dispositive on the issue before us. Defendant emphasizes the "waive immunities" language, but the TCA notice requirement is not an immunity. Importantly, while the Statement specifically mentions the Court Rules, it does not mention the TCA. At best, the Statement is ambiguous on the issue. Nor are we persuaded by Massachusetts precedent relied on by defendant. In *Com. v. ELM Med. Lab., Inc.,* 33 *Mass.App. Ct.* 71, 596 *N.E.*2d 376, 379–81 (1992), the court held that the Massachusetts CRA did not waive the state's sovereign immunity as established by its TCA. The decision says nothing about the

---

3 And, insofar as claims are based on federal civil rights violations, 42 *U.S.C.* § 1983, it would violate the Supremacy Clause to restrict such causes of action by applying a state statute such as the TCA. *Fuchilla, supra,* 109 *N.J.* at 331, 537 *A.*2d 652.

applicability of TCA notice requirements to claims against individual state employees, as here.

Thus, we conclude that the broad remedial purposes of the CRA are not the sort of claims to which the TCA was a legislative response. *Fuchilla, supra,* 109 *N.J.* at 341–43, 537 *A.*2d 652 (Handler, J., concurring). As Justice Handler said, the TCA was not designed to "vindicate societal interests or to rectify public or governmental misconduct or to protect any individual constitutional interest or civil right," *id.* at 344, 537 *A.*2d 652, all matters that are addressed by the CRA. For the foregoing reasons, and noting the similar purposes of the CRA on the one hand, and the LAD and § 1983 on the other hand, we conclude that the CRA is not governed by the procedural requirements of the TCA, such as its Notice of Tort Claim provision. We do not express any view on whether plaintiffs' claim against defendant comes within the CRA.

Reversed.